(Slip Opinion)            OCTOBER TERM, 2006                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WINKELMAN, A MINOR, BY AND THROUGH HIS PARENTS AND LEGAL GUARDIANS, WINKELMAN ET UX., ET AL. *v.* PARMA CITY SCHOOL DISTRICT

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 05–983.   Argued February 27, 2007—Decided May 21, 2007

Respondent school district receives federal funds under the Individuals with Disabilities Education Act (Act or IDEA), so it must provide children such as petitioner Winkelmans' son Jacob a "free appropriate public education," 20 U. S. C. §1400(d)(1)(A), in accordance with an individualized education program (IEP) that the parents, school officials, and others develop as members of the student's IEP Team. Regarding Jacob's IEP as deficient, the Winkelmans unsuccessfully appealed through IDEA's administrative review process. Proceeding without counsel, they then filed a federal-court complaint on their own behalf and on Jacob's behalf. The District Court granted respondent judgment on the pleadings. The Sixth Circuit entered an order dismissing the Winkelmans' subsequent appeal unless they obtained an attorney, citing Circuit precedent holding that because the right to a free appropriate public education belongs only to the child, and IDEA does not abrogate the common-law rule prohibiting nonlawyer parents from representing minor children, IDEA does not allow nonlawyer parents to proceed *pro se* in federal court.

*Held:*

1. IDEA grants parents independent, enforceable rights, which are not limited to procedural and reimbursement-related matters but encompass the entitlement to a free appropriate public education for their child. Pp. 4–17.

(a) IDEA's text resolves the question whether parents or only children have rights under the Act. Proper interpretation requires considering the entire statutory scheme. IDEA's goals include "en-

sur[ing] that all children with disabilities have available to them a free appropriate public education" and "that the rights of children with disabilities and parents of such children are protected," 20 U. S. C. §§1400(d)(1)(A)–(B), and many of its terms mandate or otherwise describe parental involvement. Parents play "a significant role," *Schaffer* v. *Weast*, 546 U. S. 49, 53, in the development of each child's IEP, see §§1412(a)(4), 1414(d). They are IEP team members, §1414(d)(1)(B), and their "concerns" "for enhancing [their child's] education" must be considered by the team, §1414(d)(3)(A)(ii). A State must, moreover, give "any party" who objects to the adequacy of the education provided, the IEP's construction, or related matter the opportunity "to present a complaint . . . ," §1415(b)(6), and engage in an administrative review process that culminates in an "impartial due process hearing," §1415(f)(1)(A), before a hearing officer. "Any party aggrieved by the [hearing officer's] findings and decision . . . [has] the right to bring a civil action with respect to the complaint." §1415(i)(2)(A). A court or hearing officer may require a state agency "to reimburse the parents . . . for the cost of [private school] enrollment if . . . the agency had not made a free appropriate public education available to the child." §1412(a)(10)(C)(ii). IDEA also governs when and to what extent a court may award attorney's fees, see §1415(i)(3)(B), including an award "to a prevailing party who is the parent of a child with a disability," §1415(i)(3)(B)(i)(I). Pp. 5–9.

(b) These various provisions accord parents independent, enforceable rights. Parents have enforceable rights at the administrative stage, and it would be inconsistent with the statutory scheme to bar them from continuing to assert those rights in federal court at the adjudication stage. Respondent argues that parental involvement is contemplated only to the extent parents represent their child's interests, but this view is foreclosed by the Act's provisions. The grammatical structure of IDEA's purpose of protecting "the rights of children with disabilities and parents of such children," §1400(d)(1)(B), would make no sense unless "rights" refers to the parents' rights as well as the child's. Other provisions confirm this view. See, *e.g.,* §1415(a). Even if this Court were inclined to ignore the Act's plain text and adopt respondent's countertextual reading, the Court disagrees that sole purpose driving IDEA's involvement of parents is to facilitate vindication of a child's rights. It is not novel for parents to have a recognized legal interest in their child's education and upbringing.

The Act's provisions also contradict the variation on respondent's argument that parents can be "parties aggrieved" for aspects of the hearing officer's findings and decision relating to certain procedures and reimbursements, but not "parties aggrieved" with regard to any

challenge not implicating those limited concerns. The IEP proceedings entitle parents to participate not only in the implementation of IDEA's procedures but also in the substantive formulation of their child's educational program. The Act also allows expansive challenge by parents of "any matter" related to the proceedings and requires that administrative resolution be based on whether the child "received a free appropriate public education," §§1415(f)(3(E), with judicial review to follow. The text and structure of IDEA create in parents an independent stake not only in the procedures and costs implicated by the process but also in the substantive decision to be made. Incongruous results would follow, moreover, were the Court to accept the proposition that parents' IDEA rights are limited to certain nonsubstantive matters. It is difficult to disentangle the Act's procedural and reimbursement-related rights from its substantive ones, and attempting to do so would impose upon parties a confusing and onerous legal regime, one worsened by the absence of any express guidance in IDEA concerning how a court might differentiate between these matters. This bifurcated regime would also leave some parents without any legal remedy. Pp. 9–16.

(c) Respondent misplaces its reliance on *Arlington Central School Dist. Bd. of Ed.* v. *Murphy*, 548 U. S. \_\_\_, when it contends that because IDEA was passed pursuant to the Spending Clause, it must provide clear notice before it can be interpreted to provide independent rights to parents. *Arlington* held that IDEA had not furnished clear notice before requiring States to reimburse experts' fees to prevailing parties in IDEA actions. However, this case does not invoke *Arlington*'s rule, for the determination that IDEA gives parents independent, enforceable rights does not impose any substantive condition or obligation on States that they would not otherwise be required by law to observe. The basic measure of monetary recovery is not expanded by recognizing that some rights repose in both the parent and the child. Increased costs borne by States defending against suits brought by nonlawyers do not suffice to invoke Spending Clause concerns, particularly in light of provisions in IDEA that empower courts to award attorney's fees to prevailing educational agencies if a parent files an action for an "improper purpose," §1415(i)(3)(B)(i)(III). Pp. 16–17.

2. The Sixth Circuit erred in dismissing the Winkelmans' appeal for lack of counsel. Because parents enjoy rights under IDEA, they are entitled to prosecute IDEA claims on their own behalf. In light of this holding, the Court need not reach petitioners' argument concerning whether IDEA entitles parents to litigate their child's claims *pro se*. Pp. 17–18.

Reversed and remanded.

Syllabus

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, SOUTER, GINSBURG, BREYER, and ALITO, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment in part and dissenting in part, in which THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 05–983

———————

## JACOB WINKELMAN, A MINOR, BY AND THROUGH HIS PARENTS AND LEGAL GUARDIANS, JEFF AND SANDEE WINKELMAN, ET AL., PETITIONERS *v.* PARMA CITY SCHOOL DISTRICT

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[May 21, 2007]

JUSTICE KENNEDY delivered the opinion of the Court.

Some four years ago, Mr. and Mrs. Winkelman, parents of five children, became involved in lengthy administrative and legal proceedings. They had sought review related to concerns they had over whether their youngest child, 6-year-old Jacob, would progress well at Pleasant Valley Elementary School, which is part of the Parma City School District in Parma, Ohio.

Jacob has autism spectrum disorder and is covered by the Individuals with Disabilities Education Act (Act or IDEA), 84 Stat. 175, as amended, 20 U. S. C. §1400 *et seq.* (2000 ed. and Supp. IV). His parents worked with the school district to develop an individualized education program (IEP), as required by the Act. All concede that Jacob's parents had the statutory right to contribute to this process and, when agreement could not be reached, to participate in administrative proceedings including what the Act refers to as an "impartial due process hearing." §1415(f)(1)(A) (2000 ed., Supp. IV).

The disagreement at the center of the current dispute concerns the procedures to be followed when parents and their child, dissatisfied with the outcome of the due process hearing, seek further review in a United States District Court. The question is whether parents, either on their own behalf or as representatives of the child, may proceed in court unrepresented by counsel though they are not trained or licensed as attorneys. Resolution of this issue requires us to examine and explain the provisions of IDEA to determine if it accords to parents rights of their own that can be vindicated in court proceedings, or alternatively, whether the Act allows them, in their status as parents, to represent their child in court proceedings.

I

Respondent Parma City School District, a participant in IDEA's educational spending program, accepts federal funds for assistance in the education of children with disabilities. As a condition of receiving funds, it must comply with IDEA's mandates. IDEA requires that the school district provide Jacob with a "free appropriate public education," which must operate in accordance with the IEP that Jacob's parents, along with school officials and other individuals, develop as members of Jacob's "IEP Team." Brief for Petitioners 3 (internal quotation marks omitted).

The school district proposed an IEP for the 2003–2004 school year that would have placed Jacob at a public elementary school. Regarding this IEP as deficient under IDEA, Jacob's nonlawyer parents availed themselves of the administrative review provided by IDEA. They filed a complaint alleging respondent had failed to provide Jacob with a free appropriate public education; they appealed the hearing officer's rejection of the claims in this complaint to a state-level review officer; and after losing that appeal they filed, on their own behalf and on behalf of

Jacob, a complaint in the United States District Court for the Northern District of Ohio. In reliance upon 20 U. S. C. §1415(i)(2) (2000 ed., Supp. IV) they challenged the administrative decision, alleging, among other matters: that Jacob had not been provided with a free appropriate public education; that his IEP was inadequate; and that the school district had failed to follow procedures mandated by IDEA. Pending the resolution of these challenges, the Winkelmans had enrolled Jacob in a private school at their own expense. They had also obtained counsel to assist them with certain aspects of the proceedings, although they filed their federal complaint, and later their appeal, without the aid of an attorney. The Winkelmans' complaint sought reversal of the administrative decision, reimbursement for private-school expenditures and attorney's fees already incurred, and, it appears, declaratory relief.

The District Court granted respondent's motion for judgment on the pleadings, finding it had provided Jacob with a free appropriate public education. Petitioners, proceeding without counsel, filed an appeal with the Court of Appeals for the Sixth Circuit. Relying on its recent decision in *Cavanaugh* v. *Cardinal Local School Dist.*, 409 F. 3d 753 (2005), the Court of Appeals entered an order dismissing the Winkelmans' appeal unless they obtained counsel to represent Jacob. See Order in No. 05–3886 (Nov. 4, 2005), App. A to Pet. for Cert. 1a. In *Cavanaugh* the Court of Appeals had rejected the proposition that IDEA allows nonlawyer parents raising IDEA claims to proceed *pro se* in federal court. The court ruled that the right to a free appropriate public education "belongs to the child alone," 409 F. 3d, at 757, not to both the parents and the child. It followed, the court held, that "any right on which the [parents] could proceed on their own behalf would be derivative" of the child's right, *ibid.*, so that parents bringing IDEA claims were not appearing on their

own behalf, *ibid.* See also 28 U. S. C. §1654 (allowing parties to prosecute their own claims *pro se*). As for the parents' alternative argument, the court held, nonlawyer parents cannot litigate IDEA claims on behalf of their child because IDEA does not abrogate the common-law rule prohibiting nonlawyer parents from representing minor children. 409 F. 3d, at 756. As the court in *Cavanaugh* acknowledged, its decision brought the Sixth Circuit in direct conflict with the First Circuit, which had concluded, under a theory of "statutory joint rights," that the Act accords to parents the right to assert IDEA claims on their own behalf. See *Maroni* v. *Pemi-Baker Regional School Dist.*, 346 F. 3d 247, 249, 250 (CA1 2003).

Petitioners sought review in this Court. In light of the disagreement among the Courts of Appeals as to whether a nonlawyer parent of a child with a disability may prosecute IDEA actions *pro se* in federal court, we granted certiorari. 549 U. S. ___ (2006). Compare *Cavanaugh*, *supra*, with *Maroni*, *supra;* see also *Mosely* v. *Board of Ed. of Chicago*, 434 F. 3d 527 (CA7 2006); *Collinsgru* v. *Palmyra Bd. of Ed.*, 161 F. 3d 225 (CA3 1998); *Wenger* v. *Canastota Central School Dist.*, 146 F. 3d 123 (CA2 1998) *(per curiam); Devine* v. *Indian River Cty. School Bd.*, 121 F. 3d 576 (CA11 1997).

## II

Our resolution of this case turns upon the significance of IDEA's interlocking statutory provisions. Petitioners' primary theory is that the Act makes parents real parties in interest to IDEA actions, not "mer[e] guardians of their children's rights." Brief for Petitioners 16. If correct, this allows Mr. and Mrs. Winkelman back into court, for there is no question that a party may represent his or her own interests in federal court without the aid of counsel. See 28 U. S. C. §1654 ("In all courts of the United States the parties may plead and conduct their own cases personally

or by counsel . . .").  Petitioners cannot cite a specific provision in IDEA mandating in direct and explicit terms that parents have the status of real parties in interest.  They instead base their argument on a comprehensive reading of IDEA.  Taken as a whole, they contend, the Act leads to the necessary conclusion that parents have independent, enforceable rights.  Brief for Petitioners 14 (citing *Koons Buick Pontiac GMC, Inc.* v. *Nigh*, 543 U. S. 50, 60 (2004)).  Respondent, accusing petitioners of "knit[ting] together various provisions pulled from the crevices of the statute" to support these claims, Brief for Respondent 19, reads the text of IDEA to mean that any redressable rights under the Act belong only to children, *id.*, at 19–40.

We agree that the text of IDEA resolves the question presented.  We recognize, in addition, that a proper interpretation of the Act requires a consideration of the entire statutory scheme.  See *Dolan* v. *Postal Service*, 546 U. S. 481, 486 (2006).  Turning to the current version of IDEA, which the parties agree governs this case, we begin with an overview of the relevant statutory provisions.

A

The goals of IDEA include "ensur[ing] that all children with disabilities have available to them a free appropriate public education" and "ensur[ing] that the rights of children with disabilities and parents of such children are protected."   20  U. S. C.  §§1400(d)(1)(A)–(B)  (2000  ed., Supp. IV).  To this end, the Act includes provisions governing four areas of particular relevance to the Winkelmans' claim: procedures to be followed when developing a child's IEP; criteria governing the sufficiency of an education provided to a child; mechanisms for review that must be made available when there are objections to the IEP or to other aspects of IDEA proceedings; and the requirement in certain circumstances that States reimburse parents for various  expenses.    See  generally  §§1412(a)(10),  1414,

1415. Although our discussion of these four areas does not identify all the illustrative provisions, we do take particular note of certain terms that mandate or otherwise describe parental involvement.

IDEA requires school districts to develop an IEP for each child with a disability, see §§1412(a)(4), 1414(d), with parents playing "a significant role" in this process, *Schaffer* v. *Weast*, 546 U. S. 49, 53 (2005). Parents serve as members of the team that develops the IEP. §1414(d)(1)(B). The "concerns" parents have "for enhancing the education of their child" must be considered by the team. §1414(d)(3)(A)(ii). IDEA accords parents additional protections that apply throughout the IEP process. See, *e.g.*, §1414(d)(4)(A) (requiring the IEP Team to revise the IEP when appropriate to address certain information provided by the parents); §1414(e) (requiring States to "ensure that the parents of [a child with a disability] are members of any group that makes decisions on the educational placement of their child"). The statute also sets up general procedural safeguards that protect the informed involvement of parents in the development of an education for their child. See, *e.g.*, §1415(a) (requiring States to "establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education"); §1415(b)(1) (mandating that States provide an opportunity for parents to examine all relevant records). See generally §§1414, 1415. A central purpose of the parental protections is to facilitate the provision of a "'free appropriate public education,'" §1401(9), which must be made available to the child "in conformity with the [IEP]," §1401(9)(D).

The Act defines a "free appropriate public education" pursuant to an IEP to be an educational instruction "specially designed . . . to meet the unique needs of a child with a disability," §1401(29), coupled with any additional

"'related services'" that are "required to assist a child with a disability to benefit from [that instruction]," §1401(26)(A). See also §1401(9). The education must, among other things, be provided "under public supervision and direction," "meet the standards of the State educational agency," and "include an appropriate preschool, elementary school, or secondary school education in the State involved." *Ibid.* The instruction must, in addition, be provided at "no cost to parents." §1401(29). See generally *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty.* v. *Rowley*, 458 U. S. 176 (1982) (discussing the meaning of "free appropriate public education" as used in the statutory precursor to IDEA).

When a party objects to the adequacy of the education provided, the construction of the IEP, or some related matter, IDEA provides procedural recourse: It requires that a State provide "[a]n opportunity for any party to present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." §1415(b)(6). By presenting a complaint a party is able to pursue a process of review that, as relevant, begins with a preliminary meeting "where the parents of the child discuss their complaint" and the local educational agency "is provided the opportunity to [reach a resolution]." §1415(f)(1)(B)(i)(IV). If the agency "has not resolved the complaint to the satisfaction of the parents within 30 days," §1415(f)(1)(B)(ii), the parents may request an "impartial due process hearing," §1415(f)(1)(A), which must be conducted either by the local educational agency or by the state educational agency, *ibid.*, and where a hearing officer will resolve issues raised in the complaint, §1415(f)(3).

IDEA sets standards the States must follow in conducting these hearings. Among other things, it indicates that the hearing officer's decision "shall be made on substan-

tive grounds based on a determination of whether the child received a free appropriate public education," and that, "[i]n matters alleging a procedural violation," the officer may find a child "did not receive a free appropriate public education" only if the violation

> "(I) impeded the child's right to a free appropriate public education;
> "(II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
> "(III) caused a deprivation of educational benefits." §§1415(f)(3)(E)(i)–(ii).

If the local educational agency, rather than the state educational agency, conducts this hearing, then "any party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision to the State educational agency." §1415(g)(1). Once the state educational agency has reached its decision, an aggrieved party may commence suit in federal court: "Any party aggrieved by the findings and decision made [by the hearing officer] shall have the right to bring a civil action with respect to the complaint." §1415(i)(2)(A); see also §1415(i)(1).

IDEA, finally, provides for at least two means of cost recovery that inform our analysis. First, in certain circumstances it allows a court or hearing officer to require a state agency "to reimburse the parents [of a child with a disability] for the cost of [private school] enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child." §1412(a)(10)(C)(ii). Second, it sets forth rules governing when and to what extent a court may award attorney's fees. See §1415(i)(3)(B). Included in this section is a provision allowing an award "to a prevailing party

who is the parent of a child with a disability."
§1415(i)(3)(B)(i)(I).

B

Petitioners construe these various provisions to accord
parents independent, enforceable rights under IDEA. We
agree. The parents enjoy enforceable rights at the admin-
istrative stage, and it would be inconsistent with the
statutory scheme to bar them from continuing to assert
these rights in federal court.

The statute sets forth procedures for resolving disputes
in a manner that, in the Act's express terms, contemplates
parents will be the parties bringing the administrative
complaints. In addition to the provisions we have cited,
we refer also to §1415(b)(8) (requiring a state educational
agency to "develop a model form to assist parents in filing
a complaint"); §1415(c)(2) (addressing the response an
agency must provide to a "parent's due process complaint
notice"); and §1415(i)(3)(B)(i) (referring to "the parent's
complaint"). A wide range of review is available: Adminis-
trative complaints may be brought with respect to "any
matter relating to . . . the provision of a free appropriate
public education." §1415(b)(6)(A). Claims raised in these
complaints are then resolved at impartial due process
hearings, where, again, the statute makes clear that
parents will be participating as parties. See generally
*supra,* at 7–8. See also §1415(f)(3)(C) (indicating "[a]
parent or agency shall request an impartial due process
hearing" within a certain period of time); §1415(e)(2)(A)(ii)
(referring to "a parent's right to a due process hearing").
The statute then grants "[a]ny party aggrieved by the
findings and decision made [by the hearing officer] . . . the
right to bring a civil action with respect to the complaint."
§1415(i)(2)(A).

Nothing in these interlocking provisions excludes a
parent who has exercised his or her own rights from statu-

tory protection the moment the administrative proceedings end. Put another way, the Act does not *sub silentio* or by implication bar parents from seeking to vindicate the rights accorded to them once the time comes to file a civil action. Through its provisions for expansive review and extensive parental involvement, the statute leads to just the opposite result.

Respondent, resisting this line of analysis, asks us to read these provisions as contemplating parental involvement only to the extent parents represent their child's interests. In respondent's view IDEA accords parents nothing more than "collateral tools related to the child's underlying substantive rights—not freestanding or independently enforceable rights." Brief for Respondent 25.

This interpretation, though, is foreclosed by provisions of the statute. IDEA defines one of its purposes as seeking "to ensure that the rights of children with disabilities and parents of such children are protected." §1400(d)(1)(B). The word "rights" in the quoted language refers to the rights of parents as well as the rights of the child; otherwise the grammatical structure would make no sense.

Further provisions confirm this view. IDEA mandates that educational agencies establish procedures "to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education." §1415(a). It presumes parents have rights of their own when it defines how States might provide for the transfer of the "rights accorded to parents" by IDEA, §1415(m)(1)(B), and it prohibits the raising of certain challenges "[n]otwithstanding any other individual right of action that a parent or student may maintain under [the relevant provisions of IDEA]," §§1401(10)(E), 1412(a)(14)(E). To adopt respondent's reading of the statute would require an interpretation of these statutory provisions (and others) far too strained to be correct.

Defending its countertextual reading of the statute, respondent cites a decision by a Court of Appeals concluding that the Act's "references to parents are best understood as accommodations to the fact of the child's incapacity." *Doe* v. *Board of Ed. of Baltimore Cty.*, 165 F. 3d 260, 263 (CA4 1998); see also Brief for Respondent 30. This, according to respondent, requires us to interpret all references to parents' rights as referring in implicit terms to the child's rights—which, under this view, are the only enforceable rights accorded by IDEA. Even if we were inclined to ignore the plain text of the statute in considering this theory, we disagree that the sole purpose driving IDEA's involvement of parents is to facilitate vindication of a child's rights. It is not a novel proposition to say that parents have a recognized legal interest in the education and upbringing of their child. See, *e.g.*, *Pierce* v. *Society of Sisters*, 268 U. S. 510, 534–535 (1925) (acknowledging "the liberty of parents and guardians to direct the upbringing and education of children under their control"); *Meyer* v. *Nebraska*, 262 U. S. 390, 399–401 (1923). There is no necessary bar or obstacle in the law, then, to finding an intention by Congress to grant parents a stake in the entitlements created by IDEA. Without question a parent of a child with a disability has a particular and personal interest in fulfilling "our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." §1400(c)(1).

We therefore find no reason to read into the plain language of the statute an implicit rejection of the notion that Congress would accord parents independent, enforceable rights concerning the education of their children. We instead interpret the statute's references to parents' rights to mean what they say: that IDEA includes provisions conveying rights to parents as well as to children.

A variation on respondent's argument has persuaded

some Courts of Appeals. The argument is that while a parent can be a "party aggrieved" for aspects of the hearing officer's findings and decision, he or she cannot be a "party aggrieved" with respect to all IDEA-based challenges. Under this view the causes of action available to a parent might relate, for example, to various procedural mandates, see, *e.g.*, *Collinsgru*, 161 F. 3d, at 233, and reimbursement demands, see, *e.g.*, §1412(a)(10)(C)(ii). The argument supporting this conclusion proceeds as follows: Because a "party aggrieved" is, by definition, entitled to a remedy, and parents are, under IDEA, only entitled to certain procedures and reimbursements as remedies, a parent cannot be a "party aggrieved" with regard to any claim not implicating these limited matters.

This argument is contradicted by the statutory provisions we have recited. True, there are provisions in IDEA stating parents are entitled to certain procedural protections and reimbursements; but the statute prevents us from placing too much weight on the implications to be drawn when other entitlements are accorded in less clear language. We find little support for the inference that parents are excluded by implication whenever a child is mentioned, and vice versa. Compare, *e.g.*, §1411(e)(3)(E) (barring States from using certain funds for costs associated with actions "brought on behalf of a child" but failing to acknowledge that actions might also be brought on behalf of a parent) with §1415(i)(3)(B)(i) (allowing recovery of attorney's fees to a "prevailing party who is the parent of a child with a disability" but failing to acknowledge that a child might also be a prevailing party). Without more, then, the language in IDEA confirming that parents enjoy particular procedural and reimbursement-related rights does not resolve whether they are also entitled to enforce IDEA's other mandates, including the one most fundamental to the Act: the provision of a free appropriate public education to a child with a disability.

We consider the statutory structure. The IEP proceedings entitle parents to participate not only in the implementation of IDEA's procedures but also in the substantive formulation of their child's educational program. Among other things, IDEA requires the IEP Team, which includes the parents as members, to take into account any "concerns" parents have "for enhancing the education of their child" when it formulates the IEP. §1414(d)(3)(A)(ii). The IEP, in turn, sets the boundaries of the central entitlement provided by IDEA: It defines a "'free appropriate public education'" for that parent's child. §1401(9).

The statute also empowers parents to bring challenges based on a broad range of issues. The parent may seek a hearing on "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." §1415(b)(6)(A). To resolve these challenges a hearing officer must make a decision based on whether the child "received a free appropriate public education." §1415(f)(3)(E). When this hearing has been conducted by a local educational agency rather than a state educational agency, "any party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision" to the state educational agency. §1415(g)(1). Judicial review follows, authorized by a broadly worded provision phrased in the same terms used to describe the prior stage of review: "[a]ny party aggrieved" may bring "a civil action." §1415(i)(2)(A).

These provisions confirm that IDEA, through its text and structure, creates in parents an independent stake not only in the procedures and costs implicated by this process but also in the substantive decisions to be made. We therefore conclude that IDEA does not differentiate, through isolated references to various procedures and remedies, between the rights accorded to children and the rights accorded to parents. As a consequence, a parent

may be a "party aggrieved" for purposes of §1415(i)(2) with regard to "any matter" implicating these rights. See §1415(b)(6)(A). The status of parents as parties is not limited to matters that relate to procedure and cost recovery. To find otherwise would be inconsistent with the collaborative framework and expansive system of review established by the Act. Cf. *Cedar Rapids Community School Dist.* v. *Garret F.,* 526 U. S. 66, 73 (1999) (looking to IDEA's "overall statutory scheme" to interpret its provisions).

Our conclusion is confirmed by noting the incongruous results that would follow were we to accept the proposition that parents' IDEA rights are limited to certain non-substantive matters. The statute's procedural and reimbursement-related rights are intertwined with the substantive adequacy of the education provided to a child, see, *e.g.,* §1415(f)(3)(E), see also §1412(a)(10)(C)(ii), and it is difficult to disentangle the provisions in order to conclude that some rights adhere to both parent and child while others do not. Were we nevertheless to recognize a distinction of this sort it would impose upon parties a confusing and onerous legal regime, one worsened by the absence of any express guidance in IDEA concerning how a court might in practice differentiate between these matters. It is, in addition, out of accord with the statute's design to interpret the Act to require that parents prove the substantive inadequacy of their child's education as a predicate for obtaining, for example, reimbursement under §1412(a)(10)(C)(ii), yet to prevent them from obtaining a judgment mandating that the school district provide their child with an educational program demonstrated to be an appropriate one. The adequacy of the educational program is, after all, the central issue in the litigation. The provisions of IDEA do not set forth these distinctions, and we decline to infer them.

The bifurcated regime suggested by the courts that have

employed it, moreover, leaves some parents without a remedy. The statute requires, in express terms, that States provide a child with a free appropriate public education "at public expense," §1401(9)(A), including specially designed instruction "at no cost to parents," §1401(29). Parents may seek to enforce this mandate through the federal courts, we conclude, because among the rights they enjoy is the right to a free appropriate public education for their child. Under the countervailing view, which would make a parent's ability to enforce IDEA dependant on certain procedural and reimbursement-related rights, a parent whose disabled child has not received a free appropriate public education would have recourse in the federal courts only under two circumstances: when the parent happens to have some claim related to the procedures employed; and when he or she is able to incur, and has in fact incurred, expenses creating a right to reimbursement. Otherwise the adequacy of the child's education would not be regarded as relevant to any cause of action the parent might bring; and, as a result, only the child could vindicate the right accorded by IDEA to a free appropriate public education.

The potential for injustice in this result is apparent. What is more, we find nothing in the statute to indicate that when Congress required States to provide adequate instruction to a child "at no cost to parents," it intended that only some parents would be able to enforce that mandate. The statute instead takes pains to "ensure that the rights of children with disabilities and parents of such children are protected." §1400(d)(1)(B). See, *e.g.*, §1415(e)(2) (requiring that States implement procedures to ensure parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education); §1415(e)(2)(A)(ii) (requiring that mediation procedures not be "used to deny or delay a parent's right to a due process hearing . . . or to deny any other rights

afforded under this subchapter"); cf. §1400(c)(3) (noting IDEA's success in "ensuring children with disabilities and the families of such children access to a free appropriate public education").

We conclude IDEA grants parents independent, enforceable rights. These rights, which are not limited to certain procedural and reimbursement-related matters, encompass the entitlement to a free appropriate public education for the parents' child.

C

Respondent contends, though, that even under the reasoning we have now explained petitioners cannot prevail without overcoming a further difficulty. Citing our opinion in *Arlington Central School Dist. Bd. of Ed.* v. *Murphy*, 548 U. S. ___ (2006), respondent argues that statutes passed pursuant to the Spending Clause, such as IDEA, must provide "'clear notice'" before they can burden a State with some new condition, obligation, or liability. Brief for Respondent 41. Respondent contends that because IDEA is, at best, ambiguous as to whether it accords parents independent rights, it has failed to provide clear notice of this condition to the States. See *id.*, at 40–49.

Respondent's reliance on *Arlington* is misplaced. In *Arlington* we addressed whether IDEA required States to reimburse experts' fees to prevailing parties in IDEA actions. "[W]hen Congress attaches conditions to a State's acceptance of federal funds," we explained, "the conditions must be set out 'unambiguously.'" 548 U. S., at ___ (slip op., at 3) (quoting *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981)). The question to be answered in *Arlington*, therefore, was whether IDEA "furnishes clear notice regarding the liability at issue." 548 U. S., at ___ (slip op., at 4). We found it did not.

The instant case presents a different issue, one that does not invoke the same rule. Our determination that

IDEA grants to parents independent, enforceable rights does not impose any substantive condition or obligation on States they would not otherwise be required by law to observe. The basic measure of monetary recovery, more-over, is not expanded by recognizing that some rights repose in both the parent and the child. Were we consid-ering a statute other than the one before us, the Spending Clause argument might have more force: A determination by the Court that some distinct class of people has inde-pendent, enforceable rights might result in a change to the States' statutory obligations. But that is not the case here.

Respondent argues our ruling will, as a practical matter, increase costs borne by the States as they are forced to defend against suits unconstrained by attorneys trained in the law and the rules of ethics. Effects such as these do not suffice to invoke the concerns under the Spending Clause. Furthermore, IDEA does afford relief for the States in certain cases. The Act empowers courts to award attorney's fees to a prevailing educational agency when-ever a parent has presented a "complaint or subsequent cause of action . . . for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly in-crease the cost of litigation." §1415(i)(3)(B)(i)(III). This provision allows some relief when a party has proceeded in violation of these standards.

## III

The Court of Appeals erred when it dismissed the Winkelmans' appeal for lack of counsel. Parents enjoy rights under IDEA; and they are, as a result, entitled to prosecute IDEA claims on their own behalf. The decision by Congress to grant parents these rights was consistent with the purpose of IDEA and fully in accord with our social and legal traditions. It is beyond dispute that the relationship between a parent and child is sufficient to

support a legally cognizable interest in the education of one's child; and, what is more, Congress has found that "the education of children with disabilities can be made more effective by . . . strengthening the role and responsibility of parents and ensuring that families of such children have meaningful opportunities to participate in the education of their children at school and at home." §1400(c)(5).

In light of our holding we need not reach petitioners' alternative argument, which concerns whether IDEA entitles parents to litigate their child's claims *pro se*.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 05–983

———————

JACOB WINKELMAN, A MINOR, BY AND THROUGH HIS
PARENTS AND LEGAL GUARDIANS, JEFF AND SANDEE
WINKELMAN, ET AL., PETITIONERS *v.* PARMA
CITY SCHOOL DISTRICT

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[May 21, 2007]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment in part and dissenting in part.

I would hold that parents have the right to proceed *pro se* under the Individuals with Disabilities Education Act (IDEA), 20 U. S. C. §1400 *et seq.* (2000 ed. and Supp. IV), when they seek reimbursement for private school expenses or redress for violations of their own procedural rights, but not when they seek a judicial determination that their child's free appropriate public education (or FAPE) is substantively inadequate.

Whether parents may bring suits under the IDEA without a lawyer depends upon the interaction between the IDEA and the general *pro se* provision in the Judiciary Act of 1789. The latter, codified at 28 U. S. C. §1654, provides that "[i]n all courts of the United States *the parties* may plead and conduct their own cases personally or by counsel." (Emphasis added.) The IDEA's right-to-sue provision, 20 U. S. C. §1415(i)(2)(A) (2000 ed., Supp. IV), provides that "[a]ny *party aggrieved* by the findings and decision [of a hearing officer] shall have the right to bring a civil action with respect to the [administrative] complaint." (Emphasis added.) Thus, when parents are "parties aggrieved" under the IDEA, they are "parties" within

the meaning of 28 U. S. C. §1654, entitled to sue on their own behalf.[1]

As both parties agree, see Tr. of Oral Arg. 7; Brief for Respondent 37, "party aggrieved" means "[a] party entitled to a remedy; esp., a party whose personal, pecuniary, or property rights have been adversely affected by another person's actions or by a court's decree or judgment," Black's Law Dictionary 1154 (8th ed. 2004); see also *ante*, at 12. This case thus turns on the rights that the IDEA accords to parents, and the concomitant remedies made available to them. Only with respect to such rights and remedies are parents properly viewed as "parties aggrieved," capable of filing their own cases in federal court.

A review of the statutory text makes clear that, as relevant here, the IDEA grants parents only two types of rights.[2] First, under certain circumstances "a court or a hearing officer may require the [school district] to reimburse *the parents*" for private school expenditures "if the court or hearing officer finds that the [school district] had not made a free appropriate public education available to the child." 20 U. S. C. §1412(a)(10)(C)(ii) (2000 ed., Supp. IV) (emphasis added). Second, parents are accorded a

_____

[1] As the Court notes, *ante*, at 2, 18, petitioners also argue that even if parents do not have their own rights under the statute, they nonetheless may act on behalf of their child without retaining a lawyer. Both sides agree, however, that the common law generally prohibited lay parents from representing their children in court, a manifestation of the more general common-law rule that nonattorneys cannot litigate the interests of another. See Brief for Petitioners 37; Brief for Respondent 9–10; see also, *e.g.*, *Collingsru* v. *Palmyra Bd. of Ed.*, 161 F. 3d 225, 232 (CA3 1998). Nothing in the IDEA suggests a departure from that rule.

[2] Because the grant of those rights is clear, and because I find no statutory basis for any other rights, I need not decide whether the Spending Clause's "clear notice" requirement is applicable here. Cf. *Arlington Central School Dist. Bd. of Ed.* v. *Murphy*, 548 U. S. ___, ___ (2006) (slip op., at 4).

variety of procedural protections, both during the development of their child's individualized education program (IEP), see, *e.g.*, §1414(d)(1)(B)(i) (parents are members of their child's IEP team); §1415(b)(1) (parents must have an opportunity to examine records and participate in IEP meetings), and in any subsequent administrative challenges, see, *e.g.*, §§1415(b)(6), (8) (parents may file administrative due process complaints). It is clear that parents may object to procedural violations at the administrative due process hearing, see §1415(b)(6)(A), and that a hearing officer may provide relief to parents for certain procedural infractions, see §1415(f)(3)(E)(ii). Because the rights to reimbursement and to the various procedural protections are accorded to parents themselves, they are "parties aggrieved" when those rights are infringed, and may accordingly proceed *pro se* when seeking to vindicate them.[3]

The Court goes further, however, concluding that parents may proceed *pro se* not only when they seek reimbursement or assert procedural violations, but also when they challenge the substantive adequacy of their child's FAPE—so that parents may act without a lawyer *in every IDEA case*. See *ante*, at 11–16. In my view, this sweeps far more broadly than the text allows. Out of this sprawling statute the Court cannot identify even *a single* provision stating that parents have the substantive right to a FAPE. The reason for this is readily understandable: The right to a free appropriate public education obviously inheres in the child, for it is he who receives the education.

---

[3] Of course when parents assert procedural violations, they must also allege that those violations adversely affected the outcome of the proceedings. Under Article III, one does not have standing to challenge a procedural violation without having some concrete interest in the outcome of the proceeding to which the violation pertains, see *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 571–578 (1992), here the parents' interest in having their child receive an appropriate education.

As the IDEA instructs, participating States must provide a "free appropriate public education . . . to all children with disabilities . . . ." §1412(a)(1)(A) (2000 ed., Supp. IV). The statute is replete with references to the fact that a FAPE belongs to the child. See, *e.g.,* §1400(d)(1)(A) (IDEA designed "to ensure that all children with disabilities have available to them a free appropriate public education"); §1408(a)(2)(C)(i) (referring to "the right of a child" to "receive a free appropriate public education"); §1411(e)(3)(F)(i) (same); §1414(a)(1)(D)(i)(II) (referring to an agency "that is responsible for making a free appropriate public education available to a child"); §1415(b)(6)(A) (referring to "the provision of a free appropriate public education to [a] child"). The parents of a disabled child no doubt have an *interest* in seeing their child receive a proper education. But there is a difference between an *interest* and a statutory *right*. The text of the IDEA makes clear that parents have no *right* to the education itself.[4]

The Court concedes, as it must, that while the IDEA gives parents the right to reimbursement and procedural protection in explicit terms, it does not do so for the supposed right to the education itself. *Ante*, at 12. The obvious inference to be drawn from the statute's clear and explicit conferral of discrete types of rights upon parents and children, respectively, is that it does not by accident confer the parent-designated rights upon children, or the children-designated rights upon parents. The Court believes, however, that "the statute prevents us from placing too much weight on [this] implicatio[n]." *Ibid.* That conclusion is in error. Nothing in "the statute," undermines the obvious "implication" of Congress's scheme. What the

—————

[4] Nor can a parental right to education be justified, as the Court attempts, see *ante*, at 14–15, on the theory that the IDEA gives parents a legal right to *free* schooling for their child. Parents acquire such a right (in limited circumstances) only when they enroll their child in a private institution. §1412(a)(10)(C)(ii) (2000 ed., Supp. IV).

Court relies upon for its conclusion that parents have a substantive right to a FAPE is not the "statutory structure," *ante*, at 13, but rather the myriad *procedural* guarantees accorded to parents in the administrative process, see *ibid.* But allowing parents, by means of these guarantees, to help shape the contours of their child's education is simply not the same as giving *them* the right to that education. Nor can the Court sensibly rely on the provisions governing due process hearings and administrative appeals, the various provisions that refer to the "parent's complaint," see, *e.g.,* 20 U. S. C. §1415(i)(3)(B)(i)(III) (2000 ed., Supp. IV), or the fact that the right-to-sue provision, §1415(i)(2)(A), refers to the administrative complaint, which in turn allows parents to challenge "any matter" relating to the provision of a FAPE, §1415(b)(6)(A). These provisions prove nothing except what all parties concede: that parents *may* represent their child *pro se* at the administrative level. See Brief for Petitioners 17–18, 40; Brief for United States as *Amicus Curiae* 12; Brief for Respondent 13, 44; see also *Collingsru* v. *Palmyra Bd. of Ed.*, 161 F. 3d 225, 232 (CA3 1998). Parents thus have the power, at the administrative stage, to litigate *all* of the various rights under the statute since at that stage they are acting not only on their *own* behalf, but on behalf of *their child* as well. This tells us nothing whatever about *whose* rights they are.[5] The Court's spraying statutory

_____

[5] Contrary to indications in the Court's opinion, *ante*, at 13, and to the apparent language of the statute, a hearing officer does not always render a decision "on substantive grounds based on a determination of whether the child received a free appropriate public education." §1415(f)(3)(E)(i) (2000 ed., Supp. IV). That provision is "[s]ubject to clause (ii)," *ibid.*, which provides that "[i]n matters alleging a procedural violation" a hearing officer can grant relief if "the procedural inadequacies . . . significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child," §1415(f)(3)(E)(ii)(II). It is true that a hearing officer who accepts such

sections about like buckshot cannot create a substantive parental right to education where none exists.

Harkening back to its earlier discussion of the IDEA's "text and structure" (by which it means the statute's procedural protections), the Court announces the startling proposition that, in fact, the "IDEA does not differentiate . . . between the rights accorded to children and the rights accorded to parents." *Ante*, at 13. If that were so, the Court could have spared us its painful effort to craft a distinctive parental right out of scattered procedural provisions. But of course it is not so. The IDEA quite clearly differentiates between the rights accorded to parents and their children. See *Emery* v. *Roanoke City School Bd.*, 432 F. 3d 294, 299 (CA4 2005) ("[P]arents and children are distinct legal entities under the IDEA" (internal quotation marks omitted)). As even petitioners' *amici* agree, "Congress specifically indicated that parents have rights under the Act that are separate from and independent of their children's rights." Brief for Senator Edward M. Kennedy et al. as *Amici Curiae* 18. Does the Court seriously contend that a child has a right to reimbursement, when the statute most definitively provides that if "*the parents* of a child with a disability" enroll that child in private school, "a court . . . may require the [school dis-

––––––––––

an allegation nominally grants relief by concluding that the child did not receive a FAPE, §1415(f)(3)(E)(ii), but it is clear from the structure of the statute that this is not a decision on the substantive adequacy of the FAPE, but rather the label attached to a finding of procedural defect. Petitioners agree with me on this point. See Brief for Petitioners 31, n. 23. See also 20 U. S. C. §1415(f)(3)(E)(iii) (2000 ed., Supp. IV) ("Nothing in this subparagraph shall be construed to preclude a hearing officer from ordering a local educational agency to comply with procedural requirements under this section"). In any event, even if a hearing officer was required to render a decision on the substantive adequacy of the FAPE, that feature of the statute still gives no clue as to whether parents' vindication of that substantive right at the administrative stage is on their own behalf or on behalf of the child.

trict] to reimburse *the parents* for the cost of that enroll-ment"?  §1412(a)(10)(C)(ii) (2000 ed., Supp. IV) (emphasis added); see also Brief for Senator Edward M. Kennedy et al. as *Amici Curiae* 21 ("The right of reimbursement runs to the parents").  Does the Court believe that a child has a procedural right under §§1414(d)(1)(C)(i)–(iii) (2000 ed., Supp. IV), which gives *parents* the power to excuse an IEP team member from attending an IEP meeting?  The IDEA does not remotely envision communal "family" rights.

The Court believes that because parents must prove the substantive inadequacy of a FAPE before obtaining reim-bursement, §1412(a)(10)(C)(ii) (2000 ed., Supp. IV), and because the suitability of a FAPE may also be at issue when procedural violations are alleged, §1415(f)(3)(E)(ii), it is "out of accord with the statute's design" to "prevent [parents] from obtaining a judgment mandating that the school district provide their child" with a FAPE.  *Ante*, at 14.  That is a total non sequitur.  That Congress has re-quired parents to demonstrate the inadequacy of their child's FAPE in order to vindicate their own rights says nothing about whether parents possess an underlying right to education.  The Court insists that the right to a FAPE is the right "most fundamental to the Act."  *Ante*, at 12.  Undoubtedly so, but that sheds no light upon whom the right belongs to, and hence upon who can sue in their own right.  Congress has used the phrase "party ag-grieved," and it is this Court's job to apply that language, not to run from it.

The Court further believes that a distinction between parental and child rights will prove difficult to administer. I fail to see why that is so.  Before today, the majority of Federal Courts of Appeals to have considered the issue have allowed parents to sue *pro se* with respect to some claims, but not with respect to the denial of a FAPE.  See *Mosely* v. *Board of Ed. of Chicago*, 434 F. 3d 527, 532 (CA7

2006); *Collingsru,* 161 F. 3d, at 233; *Wenger* v. *Canastota Central School Dist.*, 146 F. 3d 123, 126 (CA2 1998) *(per curiam); Devine* v. *Indian River Cty. School Bd.*, 121 F. 3d 576, 581, n. 17 (CA11 1997). The Court points to no evidence suggesting that this majority rule has caused any confusion in practice. Nor do I see how it could, since the statute makes clear and easily administrable distinctions between parents' and children's legal entitlements.

Finally, the Court charges that the approach taken by the majority of Courts of Appeals would perpetrate an "injustice," *ante*, at 15, since parents who do not seek reimbursement or allege procedural violations would be "without a remedy," *ante*, at 14–15. That, of course, is not true. They will have the same remedy as all parents who sue to vindicate their children's rights: the power to bring suit, represented by counsel. But even indulging the Court's perception that it is unfair to allow some but not all IDEA parents to proceed *pro se*, that complaint is properly addressed to Congress, which structured the rights as it has, and limited suit to "party aggrieved." And there are good reasons for it to have done so. *Pro se* cases impose unique burdens on lower courts—and on defendants, in this case the schools and school districts that must hire their own lawyers. Since *pro se* complaints are prosecuted essentially for free, without screening by knowledgeable attorneys, they are much more likely to be unmeritorious. And for courts to figure them out without the assistance of plaintiff's counsel is much more difficult and time-consuming. In both categories of *pro se* parental suit permitted under a proper interpretation of the statute, one or the other of these burdens is reduced. Actions seeking reimbursement are less likely to be frivolous, since not many parents will be willing to lay out the money for private education without some solid reason to believe the FAPE was inadequate. And actions alleging procedural violations can ordinarily be disposed of without

the intensive record-review that characterizes suits challenging the suitability of a FAPE.

*        *        *

Petitioners sought reimbursement, alleged procedural violations, and requested a declaration that their child's FAPE was substantively inadequate. *Ante*, at 3. I agree with the Court that they may proceed *pro se* with respect to the first two claims, but I disagree that they may do so with respect to the third.