**J.G. and J.G., on behalf of J.G. Plaintiffs,**

v.

**BRIARCLIFF MANOR UNION FREE SCHOOL DISTRICT, Defendant.**

**No. 07 Civ. 7245–WGY.**

United States District Court, S.D. New York.

Jan. 29, 2010.

---

**5.** The Letter became public via a newspaper reprint after the present lawsuit commenced.

Gary S. Mayerson, Mayerson and Associates, New York, NY, for Plaintiffs.

Leah Lennon Murphy, Kuntz, Spagnuolo, & Murphy, P.C., Bedford Village, NY, for Defendant.

### Memorandum and Order

WILLIAM G. YOUNG, District Judge.[1]

The plaintiffs, J.G. and J.G. (the "Parents"), seek reimbursement on behalf of their daughter, J.G., for tuition and transportation expenses from the Briarcliff Manor union Free School District (the "District") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 et seq. The Parents allege that the District's proposed Individualized Education Program for the 2005–2006 school year was procedurally and substantively inadequate. The parties have agreed to treat the matter as a "case stated" under Rule 56 of the Federal Rules of Civil Procedure.[2] *See, e.g., E.G.*

---

1. Of the District of Massachusetts, sitting by designation.

2. Derived from the procedures of the courts of the Commonwealth of Massachusetts, *see, e.g., Parker v. Morrell,* 59 Mass.App.Dec. 34 (Mass.Dist.Ct.1976), the "case stated" procedure is firmly established in the jurisprudence of the First Circuit. *See, e.g., Boston Five Cents Sav. Bank v. Secretary of Dep't of Hous. & Urban Dev.,* 768 F.2d 5, 11–12 (1st Cir.

*v. City Sch. Dist. of New Rochelle*, 606 F.Supp.2d 384, 386 n. 2 (S.D.N.Y.2009).

## I. FINDINGS OF FACT

J.G. is an elementary school child with dyslexia. When she was in kindergarten, J.G. was noted to have trouble identifying names and sounds. Impartial Hr'g Tr. ("Tr.") 250–52. Because the Parents declined to have J.G. participate in a reading support program, J.G. instead received building level speech services for thirty minutes a week during the 2003–2004 school year. Impartial Hr'g, District Ex. ("District Ex.") 42.[3]

At the beginning of the 2004–2005 year, J.G.'s first-grade teacher evaluated J.G.'s reading skills to be below average and recommended her for the first-grade reading support program. Tr. 696, 705–09. The Parents declined because they did not want J.G. to be out of the classroom for long periods of time, Tr. 709, and instead hired a private reading tutor in September 2004. The tutor maintained contact with J.G.'s classroom teacher throughout the school year and taught J.G. using the Orton–Gillingham method. District Ex. 14 at 1; Tr. 284–85. After a parent-teacher conference in November 2004, however, the Parents agreed to have J.G. participate in the first-grade reading support program. Tr. 296. By January 2005, the teacher indicated that J.G.'s writing and spelling had improved, but that J.G. still had difficulty with decoding and reading comprehension. Tr. 339, 718, 734.

In February 2005, the Parents hired a private psychologist who administered an array of tests to assess J.G.'s general intelligence and cognitive functioning, academic achievement skills, structural analysis, and emotional functioning. Impartial Hr'g, Parents Ex. ("Parents Ex.") Q. J.G.'s cognitive functioning test results were all in the average, bright normal, and superior range. *Id.* at 3. The psychologist found, however, that J.G. had difficulty expressing herself sometimes and had difficulty repeating sentences and word sequences. *Id.* The psychologist also indicated that J.G. had a weak short-term auditory memory, had not acquired the basic decoding skills usually mastered in first grade, and had trouble with consonant-vowel-consonant words. *Id.* at 5–6. The psychologist recommended a rule-based, structured, multi-syllabic approach such as Orton–Gillingham remediation. *Id.* at 6.

After the February 2005 evaluation, the Parents referred J.G. to the District's Committee on Special Education ("CSE") for an evaluation on March 17, 2005. In May 2005, J.G. was observed to have difficulty copying words from a chart, requir-

---

1985); *Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.*, 972 F.2d 426, 429 n. 7 (1st Cir.1992); *Bunch v. W.R. Grace & Co.*, 532 F.Supp.2d 283, 286–87 (D.Mass.2008). It is a most helpful procedural device. In this session of the Court, it works like this: whenever cross motions for summary judgment reveal that the relevant facts appear without significant dispute, the courtroom deputy clerk offers the parties to treat the case as a case stated. Should they accept, as was the case here, the Court treats the undisputed facts as the established record and draws the reasonable inferences therefrom without the necessity of drawing adverse inferences against each moving party, *see* Fed.R.Civ.P.

56. The facts of the case being established, the Court affords each party thirty minutes for final argument (not the usual ten minutes per party when hearing argument on a motion). In due course, the Court enters findings and rulings as required by Fed.R.Civ.P. 52(a).

3. Many of the exhibits offered at the impartial hearing are also attached to the Parents' counsel's affidavit accompanying the Parents' present motion. These documents, however, will be referred to by the exhibit numbers and letters designated by the parties for the impartial hearing.

ing the teacher's assistance to complete her work. District Ex. 18. Soon after, the District's speech pathologist assessed J.G. and found that while J.G.'s general receptive and expressive language skills were average, she had a relative weakness in short-term auditory memory. Parents Ex. O at 8. The speech pathologist noted that this might affect J.G.'s ability to decode and recommended presenting information in smaller units using multimodal methods of reading instruction. *Id.* at 8–9.

After receiving these evaluations, Dr. Lydia Lavin ("Lavin"), Director of Pupil Personnel Services, scheduled a CSE meeting for June 13, 2005 to discuss J.G.'s issues with reading and develop an Individualized Education Program ("IEP") if needed. Among those in attendance were the Parents, Lavin, the school speech pathologist, J.G.'s classroom teacher, and J.G.'s reading support teacher. Parents Ex. C at 5. The reading support teacher stated that J.G. had made "tremendous progress" since January, while her classroom teacher noted that although J.G. could write independently, she could not always read back what she had written. The classroom teacher also indicated that J.G. was sometimes fidgety while writing and seemed to have trouble with decoding, *Id.* Although the CSE found this to be a difficult case to decide, after a discussion with the Parents, the CSE ultimately classified J.G. with a learning disability and recommended special education intervention. The CSE discussed an IEP for J.G. Parents Ex. M.

On July 22, 2005, the Parents received a draft of J.G.'s IEP for the 2005–2006 school year (the "June IEP"), the product of the June 13 meeting. Parents Ex. C. The June IEP recommended a special education English/Language Arts class; presenting information in small units; pairing verbal directions with visual cues; and a multi-modal method of teaching. *Id.* It also provided specific goals and objectives for reading, writing, and speech/language. *Id.*

On August 2, 2005, Lavin received a letter from the Parents rejecting the June IEP and stating that they were withdrawing J.G. from the District to place her in private school for the 2005–2006 school year. Parents Ex. L. The letter stated the Parents' concerns that: the IEP did not state that J.G. would receive Orton–Gillingham or Lindamood–Bell instruction; the special English class would not be sufficiently intensive; and that the IEP did not address J.G.'s learning deficits in basic mathematical functions. *Id.*

In response, Lavin's assistant, Barbara Watters ("Watters") immediately called the Parents on August 3, 2005 and left a message to schedule a meeting to address the Parents' concerns. Tr. 175; Parents Ex. V. Watters spoke to the Parents on August 4, 2005, and the Parents agreed to August 8 or 9 as possible meeting dates. Tr. 176–77. Relying on this information, Lavin commenced the usual procedure of securing the attendance of the CSE members. Tr. 181; Parents Ex. V. Lavin then sent two letters dated August 4 and August 5, 2005, respectively, to the Parents confirming the date and time of the meeting. On August 8, 2005, Mr. G called Lavin asking for an adjournment because the Parents wanted J.G.'s private tutor to be present, but the tutor would not return from vacation until late August. Parents Ex. V. In addition, Mr. G also advised that his family was going on vacation on August 15, 2005. Tr. 181–82; Parents Ex. V. When Mr. G suggested postponing the meeting until after Labor Day, Lavin responded that by law, an IEP must be in place before the start of the school year. Tr. 181–82. Lavin suggested the tutor participate by phone on August 9, and also

suggested that the CSE hold an additional meeting in September if the Parents wanted the tutor's physical presence at the meeting. Tr. 181–82; Parents Ex. V.

On August 9, 2005, the CSE met to address the Parents' concerns regarding the June IEP. When the Parents did not show up, Lavin called them to invite them to participate, but Mr. G declined. Parents Ex. B at 4; Parents Ex. V. The August 9 meeting then proceeded in the absence of the Parents. Among those present were Lavin, two regular education second-grade teachers, a second-grade special education teacher who would have taught J.G. had J.G. remained in the District, the school psychologist, and a parent member of the CSE. Parents Ex. B at 4. During the meeting, the CSE discussed monitoring J.G. for self-esteem issues, her potential placement in a special math class, and that the second-grade special education teacher who would teach J.G. was trained in both Lindamood–Bell and Orton–Gillingham methods. *Id.* The revised IEP that arose out of the August 9 meeting (the "August IEP") recommended two hours of special education English/Language Arts class and one hour of special education math class per day, recommended immediate positive reinforcement, and added specific goals and objectives for math. Parents Ex. B.

In December 2005, the Parents requested an impartial due process hearing, seeking among other things, to obtain tuition reimbursement for J.G.'s 2005–2006 school year at Windward, a private special education school in Westchester County. Parents Ex. A. After a hearing, the impartial hearing officer ("IHO") ruled that the District's IEP was procedurally and substantively adequate, and that the Parents did not prove that windward was an appropriate placement for J.G. IHO Decision at 18. Therefore, the IHO denied the Parents'

claim. *Id.* at 20. The Parents then appealed to a State Review Officer ("SRO") who affirmed the IHO's decision in a detailed, fourteen-page opinion. The Parents now seek review of the SRO's decision and allege that the SRO erred in concluding that: 1) the Parents were not denied a meaningful opportunity to participate in the development of J.G.'s IEP and 2) that the District's 2005–2006 IEP was reasonably calculated to serve J.G.'s needs. The Parents also argue that equity favors their claim for reimbursement of J.G.'s 2005–2006 Windward tuition and transportation expenses.

## II. RULINGS OF LAW

### A. Standard of Review

■ Federal courts reviewing administrative determinations under the IDEA must base their decisions on the preponderance of the evidence, taking into account the record from the administrative proceeding as well as any further evidence presented by the parties. *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir.2003). *See* 20 U.S.C. § 1415(i)(2)(B). "[T]he responsibility for determining whether a challenged IEP will provide a child with an appropriate public education," however, "rests in the first instance with administrative hearing and review officers." *P., ex rel. Mr. and Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 118 (2d Cir.2008) (internal quotation marks omitted). Thus, "[w]hile federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d at 119, 129 (2d Cir.1998) (internal citations omitted). "Deference is particularly appropri-

ate when ... the state hearing officers' review has been thorough and careful." *Id.*

## B. IDEA Overview

 The IDEA mandates that states receiving certain federal funds provide a free appropriate public education[4] ("FAPE") to children with disabilities. *See* 20 U.S.C. § 1401(8). To meet the statutory standard, a FAPE must be administered in accordance with an IEP. *Id.* The statute also mandates that children with disabilities be educated in the least restrictive environment. 20 U.S.C. § 1412(a)(5). If a state fails to provide a FAPE, a child's parents may send her to a private program and seek retroactive tuition reimbursement from the state. *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir.2005). Parents who unilaterally withdraw their child from public school and subsequently seek tuition reimbursement for a private school, however, do so at their financial risk. *See School Comm. of Burlington v. Dept. of Educ.*, 471 U.S. 359, 374–75, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). Parents challenging an IEP are entitled to reimbursement only if the court determines that; 1) the proposed IEP was procedurally or substantively inadequate; 2) the private schooling obtained by the parents is appropriate for the child's needs; and 3) the equities support the parents' claim. *Cerra*, 427 F.3d at 192. *See Burlington*, 471 U.S. at 374, 105 S.Ct. 1996. The burden of proof in such actions falls upon the party seeking relief. *Schaffer v. Weast*, 546 U.S. 49, 62, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005).

## C. Procedural Compliance

Under the IDEA, a school district must provide the parents of a disabled child with an adequate opportunity to participate in the development of an IEP.[5] *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007) (stating that the IDEA requires school districts to give parents an opportunity to play a "significant role" in developing an IEP); *Cerra*, 427 F.3d at 192. The Supreme Court noted in *Rowley* that compliance with the significant procedural provisions of the IDEA "would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Grim*, 346 F.3d at 381 (quoting *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). Not every procedural error in the development of an IEP, however, renders it inadequate under the IDEA. *Id.* If a procedural violation is alleged, a hearing officer may find that a child did not receive a FAPE only if the procedural inadequacy: 1) impeded the child's right to a FAPE; 2) significantly

---

**4.** A "free appropriate public education" means special education and related services that—

 (A) have been provided at public expense, under public supervision and direction, and without charge;

 (B) meet the standards of the State educational agency;

 (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and

 (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).

**5.** The IDEA requires "[a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent evaluation of the child." 20 U.S.C. § 1415(b)(1).

impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE to the child; or 3) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii); *Winkelman,* 550 U.S. at 524–25, 127 S.Ct. 1994.

In this case, the Parents allege that the District violated their procedural rights by: 1) failing to develop and draft the goals and objectives in the IEP *during* the June 13 meeting; 2) failing to give adequate written notice of the August 9 meeting; and 3) holding the August 9 meeting in the Parents' absence. The Parents argue that the aforementioned procedural deficiencies violate their rights under *Winkelman,* which states that parents must be given the chance to serve as members of the team that develops the IEP and that the team must take into consideration the "concerns parents have for enhancing [their child's] education," 550 U.S. at 524, 127 S.Ct. 1994 (internal quotation marks omitted). As discussed below, however, the evidence supports the conclusion that the Parents were given an adequate opportunity to participate in the development of the IEP, that the CSE took into account all of the Parents' concerns, and that J.G. was not deprived of a FAPE.

1. Development and Drafting of Goals during the IEP Meetings

First, the Parents claim that they were denied meaningful participation at the June 13 meeting because the "proposed goals and objectives for J.G.'s IEP were developed without the input of ... J.G.'s parents," and the objectives were drafted only after the June 13 IEP meeting. Pls.' Mem. on Modified De Novo Review ("Pls.' Mem.") 12–13. As the IHO pointed out, however, the Parents' letter to the District dated June 21, 2005 directly contradicts these claims. IHO Decision at 18; Parents Ex. M.

■ In their letter summarizing the June 13 meeting, the Parents write that: at first the CSE voted against classifying J.G. as learning disabled because she was a difficult case, but "her parents disagreed with this determination and *a discussion followed. Everyone at the meeting had an opportunity to further the discussion."* Parents Ex. M at 1 (emphasis added). A second vote was then taken, and the CSE decided that J.G. did qualify for such services. *Id.* at 2, The Parents' letter also states that "some of the goals and objectives discussed for an IEP were: some type of special class that has (2) 45–minute sessions a day and learning to decode [consonant-vowel-consonant] words [including] reading sight words, blending, [and] correct writing skills." *Id.* Thus, the evidence supports the conclusion that the Parents had an opportunity to and did fully engage in the discussion both regarding whether J.G. required special services and what the IEP goals and objectives should be.

■ Further, while the IEP requires a statement of measurable annual goals, 20 U.S.C. § 1414(d), there is no legal authority requiring parental presence during the actual drafting of the written IEP document. *E.G. v. City Sch. Dist. of New Rochelle,* 606 F.Supp.2d 384, 388–89 (S.D.N.Y.2009). Moreover, in this case, the Parents had an opportunity to and did respond to the goals in the IEP after it was drafted. Parents Ex, L. *See id.*

2. Inadequate Written Notice

■ The Parents next argue that their procedural rights were violated under the IDEA because the District failed to provide written notice five days prior to the August 9 meeting as required by statute, 8 N.Y.C.R.R. § 2008.1. This Court concurs with the SRO's holding that this was a de

minimis error that did not deprive J.G. of a FAPE, SRO Decision at 10.

The record shows that on August 3, immediately after receiving the Parents' letter expressing their discontent with the June IEP, the District called the Parents to schedule a meeting. On August 4, five days prior to the proposed meeting, the Parents agreed over the phone that they would be available to meet on August 9. Tr. 175–77; Parents Ex. V. Moreover, Lavin sent letters to the Parents dated August 4 and August 5, 2005 so that the Parents received written notice of the August 9 meeting at least three days [6] prior to the meeting. District Exs. 7, 8. There is no evidence that in light of the Parents' actual notice of the meeting five days prior and written notice at least three days prior to the August 9 meeting, the late written notice deprived J.G. of a FAPE. Nor is there any evidence that the short written notice caused the Parents to be absent from the August 9 meeting.

### 3. The Parents' Absence from the August 9 Meeting

■ The Parents argue that their right to meaningful participation was violated when the CSE held the August 9 meeting in their absence. Given the totality of the circumstances, this Court concurs with the SRO that the Parents were not denied meaningful participation because the Parents were afforded an opportunity to participate, the Parents declined this opportunity, and despite the Parents' absence from the meeting, the District addressed and incorporated their concerns into the August IEP.

A school district has an affirmative obligation to take steps to ensure that one or both parents of the child are present at each IEP meeting or are afforded the opportunity to participate. *Cerra,* 427 F.3d at 192–93; *see* 34 C.F.R. § 300.322. This obligation includes scheduling a meeting at a mutually agreed upon time and place, 34 C.F.R. § 300.322(a)(2), and using other methods to ensure parent participation, such as telephone or video conference calls, *id.* § 300.322(c). If unable to convince the parents that they should attend, the school district may hold the meeting in their absence, but must make a record of its attempts to arrange for the parents' presence. *Id.* § 300.322(d). In this case, the District fulfilled its obligations under the law.

Immediately upon receiving the Parents' letter dated August 2, 2005, the District properly called the Parents on August 3 to schedule another meeting. On August 4, 2005, the parties mutually agreed to an IEP meeting on August 8 or 9. Tr. 175–77; Parents Ex. V. Relying on this agreement, Lavin commenced the usual procedure of securing the attendance of the CSE members, which was more difficult than usual considering it was summer vacation from school. On August 8, 2005, Mr. G asked Lavin for an adjournment because J.G.'s private tutor who the Parents wanted at the meeting would not return from vacation until late August, at which time Mr. G's family would already be gone for vacation. Tr. 181–82. When Mr. G suggested postponing the meeting until after Labor Day, Lavin appropriately explained that the law requires an IEP to be in place before the start of the school year. Tr. 182; 34 C.F.R. § 300.323(a). Lavin then offered for the tutor and the Parents to participate by phone on August 9, and offered to hold another CSE meeting in September if the Parents wanted the tutor

---

**6.** Although the IHO found that the parents had four days written notice, IHO Decision at 16, the Parents claim they only had three days notice because they received both letters on August 6, 2005.

to be physically present. Tr. 195–96; Parents Ex. V. In light of the simultaneous unavailability of the Parents and private tutor until after Labor Day, the Parents' availability on August 9, the difficulty in assembling CSE members during the summer vacation, and the need for an IEP before the start of the school year, Lavin acted reasonably in maintaining the scheduled meeting date.

The record also shows that when the Parents did not show up to the August 9 meeting, Lavin called Mr. G to invite him to participate by phone. Mr. G, however, declined the opportunity to participate. District Ex. 6 at 4; Parents Ex. B at 4; Parents Ex. V. In line with statutory requirements, the District kept records of this and other communications offering the Parents an opportunity to participate in the August 9 meeting, both in the form of written notes by Dr. Lavin and the August IEP itself. Parents Ex. V; Parents Ex. B. Therefore, the District fulfilled its statutory obligations in offering the Parents an adequate opportunity to participate in the August 9 meeting.[7]

The Parents argue, however, that it was the District's impermissible delay in sending them a copy of the June IEP that led to the conflict in schedules in August, which then prevented the presence of all persons the Parents wanted at the August 9 meeting. Because they did not receive a copy of the June IEP until the end of July, more than a month after the June 13 meeting, the Parents argue that it was the District's actions that created the com-pressed time period in which the CSE had to meet again and create a revised IEP. As in *Cerra*, the Parents here fail to direct the Court to "any statutory provision or regulation requiring that an IEP be produced at the time parents demand ... [s]chool districts must only ensure that a child's IEP is in effect by the beginning of the school year and that the parents are provided a copy." *Cerra*, 427 F.3d at 193–94 (citing 34 C.F.R. § 300.342(a)). The record also shows that Lavin did not in bad faith withhold the June IEP as the Parents seem to suggest. Instead, Lavin explained that she had limited staff in the summer months and that she herself must review the IEPs to ensure their appropriateness before sending them out. Tr. 188.

In addition, despite their absence from the August 9 meeting, the CSE addressed the Parents' concerns regarding the June IEP. First, the August 9 meeting was called specifically to address the Parents concerns regarding the June IEP as detailed in the Parents' letter dated August 2, 2005. Parents Ex. B. at 4 (August IEP stating that purpose of meeting was "to address communication received by parent"); *see* Parents Ex. M. Second, the August IEP addresses all deficiencies as alleged by the Parents, including: 1) that the June 13 discussion did not specifically address J.G.'s fidgety behavior and frustration, *see* Parents Ex. M; 2) that 1.5 hours of special education English instruction was not sufficient, Parents Ex. L; 3) that the IEP did not specifically state the District would use Lindamood–Bell or Or-

---

7. As the SRO noted, if the circumstances were different, e.g., the meeting could have been adjourned without compromising the completion of an IEP before the first day of school, then perhaps the District would have violated procedural requirements of the IDEA by denying a reasonable adjournment. SRO Decision at 11, n. 4. *See Mr. & Mrs. M v. Ridgefield Bd. of Educ.*, No. 3:05–CV–584 (RNC), 2007 WL 987483, at *6 (D.Conn. March 30, 2007) (holding that district violated the procedural requirements of IDEA when the district made no effort to reschedule a meeting despite the parents' express and timely request for an adjournment and lack of reasons not to consider adjournment). This, however, is not the case here.

ton–Gillingham methodology to instruct J.G., *id.;* and 4) that the June IEP did not address J.G.'s weakness in basic math, *id.* In turn, the District discussed and incorporated each of these concerns into the revised IEP. In particular, the August IEP: 1) included a discussion that J.G. requires positive praise, extra support, and constant reevaluation; 2) adds an extra half hour of special English instruction; 3) adds a special math class and specific short-term goals in math; and 4) included a discussion that revealed that the special education teacher who would teach J.G. was trained in both Lindamood–Bell and Orton–Gillingham. Parents Ex. B. Therefore, the Parents' concerns were actively addressed in the August 9 meeting despite their refusal to attend.

■ Further, it is significant that the Parents had already unilaterally decided to place J.G. at Windward for the 2005–2006 school year by August 2, 2005. Mr. G testified that a tuition decision for Windward had to be made by August 1, 2005, Tr. 611, and the Parents' August 2, 2005 letter stated that "[J.G.] *will be* attending private school next year . . . . This is formal notice of us withdrawing [J.G.] from the Briarcliff Manor Union Free School District." District Ex. 9 (emphasis added). Thus, even assuming that the alleged procedural violations were legally significant, they could not have prejudiced J.G.'s education because as discussed infra, *see* Part II.D., J.G.'s IEP was appropriate and available to J.G. had her parents "chosen to avail themselves" of the program. *See Grim,* 346 F.3d at 381–82 (holding that alleged procedural violation could not have prejudiced child's education because program was substantively adequate and there was no evidence that procedural violation affected parents' decision to enroll child in private school).

The Parents' early decision by August 2, 2005 to enroll J.G. in private school also directly undercuts their argument that Lavin deprived them of meaningful participation by failing to call together a September meeting as she had previously suggested. As the SRO points out, during their August 8, 2005 conversation, Mr. G told Dr. Lavin that he "didn't see any sense in being there" at the IEP meeting(s) because "his daughter is not coming." Parents Ex. V; Tr. 414–16. Given that by August 11, 2005, the Parents' intention of enrolling J.G. at Windward became even more clear, Parents Ex. I, it was reasonable for Lavin not to hold another IEP meeting.

### D. Substantive Compliance

■ The evidence shows that the IEP offered by the District for J.G.'s 2005–2006 school year was substantively adequate under the IDEA. The IDEA requires an IEP to be "reasonably calculated to enable the child to receive educational benefit[s]." *Cerra,* 427 F.3d at 194 (internal quotation marks omitted). A school district is not required to furnish " 'every special service necessary to maximize each handicapped child's potential.' " *Id.* at 195 (quoting *Rowley,* 458 U.S. at 207, 102 S.Ct. 3034). Moreover, "[b]ecause administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Id.* at 195. An IEP is substantively adequate if it is likely to produce progress, not regression. *Walczak,* 142 F.3d at 130.

The Parents argue that the August IEP is substantively inadequate because; 1) the District failed to assess J.G.'s then-present levels of performance; 2) the IEP failed to address J.G.'s social/emotional needs; and 3) the IEP did not adequately address all

of J.G.'s learning deficits nor did it specifically state that Orton–Gillingham or Lindamood–Bell instruction would be provided. Pls.' Mem. 13–14. The Court concurs with the SRO's holding that the IEP was reasonably calculated to enable J.G. to receive educational benefit, SRO Decision at 14. The August IEP adequately addresses all of the alleged substantive deficits claimed by the Parents.

### 1. Assessment of J.G.'s Level of Performance

The Parents claim that the District failed properly to assess J.G.'s then-present levels of performance before developing an IEP, "to the extent that [the assessments] were generic and not individualized." Pls.' Mem. 14. To the contrary, the evidence shows that J.G. underwent evaluations and observation by different specialists, the results of which were carefully considered at both CSE meetings and incorporated into the IEPs.

In February 2005, J.G. was evaluated by a private psychologist who administered eighteen different tests, addressing areas including the child's intelligence, academic achievement skills, structural analysis, math skills, and vocabulary. Parents Ex. Q. The results of these tests were considered and incorporated into the June IEP. Parents Ex. C at 2–5. In March 2005, the District's speech-language pathologist conducted a speech and language assessment of the child, the results of which were also incorporated into the June IEP. *Id.* at 4–5. Moreover, during the June 13 meeting, both J.G.'s reading support teacher and classroom teacher gave detailed assessments of her then-current level of functioning in reading, decoding, writing, and her behavior in class. *Id.* at 4, The child's classroom teacher even reported that by the end of the 2004–2005 school year, her reading level was at a first-grade level,

which was appropriate. Tr. 737, 947–48. After the June IEP meeting, J.G.'s private special educator wrote a letter to the District stating that J.G. had "made strides" but recommended that the child be taught using the Orton–Gillingham method. The tutor's recommendation is reflected in the August IEP, in which the CSE discussed the fact that the second-grade teacher who would have taught J.G. was trained in both Lindamood–Bell and Orton–Gillingham. Parents Ex. B at 4. Thus, there is ample evidence that J.G. received an individualized evaluation of her then-present level of performance, which was then incorporated into both IEPs.

### 2. J.G.'s Social and Emotional Needs

Next, the Parents claim that the August IEP did not address J.G.'s social and emotional needs. The SRO's ruling that the Parents failed to show that J.G. required any such special education services at the time the August IEP was formulated, however, is amply supported by the record. SRO Decision at 14. The objective evidence shows that although J.G. sometimes lacked confidence, she did not have particular social or emotional disorders that may have warranted formal services.

The private psychologist hired by the Parents stated in her evaluation that J.G. was a "friendly cooperative youngster who sustained excellent eye contact ... was comfortable conversing about a variety of topics ... [and although] sometimes hesitant to guess ... when she was encouraged to do so, she was invariably correct." Parents Ex. Q at 2. The District's school psychologist noted that J.G. was eager to please but lacked confidence, requiring positive praise and needed to be "pushed." Parents Ex. B at 4. The August IEP addresses these observations by implementing a plan for "immediate positive reinforcement," "positive praise," constant reevaluation, and monitoring for

self-esteem issues. Parents Ex. B at 1, 4. Further, the Parents did not state in any of their communications to the District before the August 9 meeting that they believed J.G. required special services to address any serious social or emotional problems. Thus, there is no evidence that the August IEP was inadequate in this manner.

### 3. J.G.'s Learning Deficits

The Parents do not specify which of "J.G.'s learning deficits" the August IEP allegedly fails to address, *see* Pls. Mem. at 14, however the evidence here shows that the August IEP addressed all of J.G.'s observed learning deficits at the time the IEP was drafted. SRO Decision at 11–14. The Parents' private psychologist in her February 2005 evaluation indicated that while J.G.'s overall cognitive functioning in all areas was in the average to superior range, J.G. had some learning deficits in reading and in basic math.

With respect to J.G.'s reading abilities, the private psychologist noted that the child had a weak short-term auditory memory, lacked mastery of the consonant vowel consonant words, and had not acquired the basic decoding skills usually mastered in first grade. Parents Ex. Q at 5–6. The psychologist thus recommended the Lindamood–Bell or Orton–Gillingham method. *Id.* at 6. The District's speech pathologist also noted that J.G. had a relative weakness in short-term auditory memory and recommended presenting information in smaller units, repeating information as necessary and utilizing multi-modal methods of teaching and reading instruction. Parents Ex. 0 at 8. J.G.'s classroom teacher indicated that by the end of the 2004–2005 school year, the child's reading ability was at the appropriate first-grade level, Tr. 737, 947–48, but that J.G. still needed some assistance with formation of letters and some spelling, Tr. 727.

The record shows that the August IEP is tailored to J.G.'s deficits in reading. The August IEP provided for: two hours per day of a small special education English/Language Arts class; a multi-modal approach to teaching; new information to be "chunked" into smaller components; and verbal directions to be paired with verbal cues whenever possible. Moreover, the August IEP provides for specific annual goals and objectives in areas of word recognition, decoding, and comprehension skills. Moreover, the August IEP states that the teacher who would have taught J.G.'s second-grade English class is trained in both Lindamood–Bell and Orton–Gillingham. Parents Ex. B at 4; Tr. 801, 819–20. The teacher specifically testified at the impartial hearing that she teaches reading using the Orton–Gillingham method and that her approach provided for structure and immediate feedback and gratification. Tr. 800–01.

With respect to J.G.'s math skills, the Parents' private psychologist noted that the child had a "good understanding of basic concepts and applications but ... has a hard time with simple basic addition." Parents Ex. Q at 5. J.G.'s first-grade math teacher testified at the hearing that sometimes the child required a number line to help her with basic math problems. Tr. 945. In turn, the August IEP reflects that J.G. "has difficulty with remembering addition and subtraction concepts, as well as utilizing vocabulary in math word problems." Parents Ex. B at 2. To address these issues, the August IEP provides for a 15:1 special education math class for one hour per day, *id.* at 1, and lists specific goals and objectives in mathematics that reflect J.G.'s deficits, *id.* at 5–6. The August IEP also indicates that the special education math class utilizes a multi-sensory approach and that the teaching can be

geared to J.G.'s weaknesses and learning style. *Id.* at 4.

Therefore, there is no evidence that the August IEP fails adequately to address any of J.G.'s learning deficits.

## III. CONCLUSION

Because the Parents have not shown that J.G. was denied a free appropriate public education, their reimbursement claim fails. Accordingly, the Court will not address the remaining prongs of the reimbursement test regarding the appropriateness of J.G.'s placement at Windward or considerations of equity. *See Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 365 (2d Cir.2006). Therefore, judgment will enter for the District.

SO ORDERED.