M.F., a child with a disability, individually and by his parent and next best friend, T.M.; T.M., individually, Plaintiffs,

v.

IRVINGTON UNION FREE SCHOOL DISTRICT, Defendant.

No. 08 CIV 02473–WGY.

United States District Court, S.D. New York.

June 17, 2010.

Andrew K. Cuddy, Esq., Williamsville, NY, for Plaintiffs.

Vanessa Moreno Gronbach, Leah Lennon Murphy, Kuntz, Spagnuolo, & Murphy, P.C., Bedford Village, NY, for Defendant.

**Memorandum and Order**

WILLIAM G. YOUNG, District Judge.[1]

## I. INTRODUCTION

M.F. is a student with a learning disability. Between September 2002 and September 2006, M.F. attended schools within the Irvington Union Free School District (the "District"). In September 2006, dissatisfied with the individual Education Program ("IEP") provided to M.F. by the District, M.F.'s mother, T.M. (the "Parent"), unilaterally placed M.F. at The Kildonan School ("Kildonan") for the 2006–07 school year. The Parent then sought reimbursement of private school tuition from the District pursuant to the Individuals with Disabilities Education Act ("IDEA") 20 U.S.C. § 1400 *et seq.,* arguing that the District failed to provide M.F. with a free appropriate public education ("FAPE"). The impartial hearing officer (the "IHO") awarded the Parent one-half of the Kildonan tuition for the 2006–07 school year. On appeal to the New York State Education Department's Office of State Review, the state review officer (the "SRO") annulled the IHO's decision on the grounds that the District had offered M.F. a FAPE in the least restrictive environment during the 2006–07 school year. The Parent brought a civil action before this Court pursuant to 20 U.S.C. § 1415(i)(2), challenging the SRO's decision and seeking reimbursement of the full tuition and related costs at Kildonan during the 2006–07 school year, plus reasonable interest, costs, and attorneys' fees. Compl. at 9.

---

1. Of the District of Massachusetts, sitting by designation.

## II. FINDINGS OF FACT

### A. M.F.'s Educational History

M.F. has been receiving special education since the age of eighteen months. District's 56.1 Statement ¶¶ 16–23. His eligibility for special education programs and services and classification as a student with a learning disability are not in dispute. *Id.* ¶ 12.

During the 2004–05 school year, M.F. attended the Irvington Middle School as a sixth grade student. *Id.* ¶ 24. M.F. was enrolled in a self-contained special class for language arts and reading and in a consultant teacher classroom for social studies and science. *Id.* ¶ 25. He was recommended for related services of counseling, occupational therapy, and speech language therapy. *Id.* M.F.'s educational program for the 2005–06 school year was changed from a self-contained setting to consultant teacher services because it appeared to the school psychologist, Dr. Cathryn Patricola ("Dr. Patricola"), that M.F.'s "availability to learning was actually greater in the larger classroom setting." Impartial Hr'g Tr. ("Tr.") 49:20–49:22.

### B. Results of the Re-evaluation of M.F.

Beginning in October 2005, the District's CSE conducted a re-evaluation of M.F. in accordance with the Regulations of the Commissioner of Education, which mandate re-evaluation of each student recommended to receive special education services at least once every three years. District's 56.1 Statement ¶¶ 29–77.

A speech language evaluation was conducted by the District's speech language pathologist. *Id.* ¶ 32. An updated psychological evaluation was also conducted by Dr. Patricola. *Id.* ¶ 34. An updated educational evaluation was performed by Mr. James Buckley ("Mr. Buckley"), M.F.'s special education teacher during the 2005–

06 school year. Tr. 338; District Ex. 16. Mr. Buckley administered the Wechsler Individual Achievement Test, second edition ("WIAT–II"), which measures a student's reading, writing, oral language, and math abilities. District's 56.1 Statement ¶ 69. The results of the test were available and shared at a CSE meeting held on March 22, 2006 (the "March CSE Meeting"). The report, however, was not actually drafted until June 2006, after the March CSE Meeting. Tr. 344–45, 350. The testing demonstrated that M.F. was weak in decoding but strong in comprehension. District's 56.1 Statement ¶ 72. Mr. Buckley concluded that M.F.'s academic difficulties were "clearly a function of his weakness in reading and written expression" and that M.F.'s "behavioral and attentional issues probably arise from the frustration this engenders." District Ex. 16 at 4, He recommended that decoding skills be emphasized, as well as strategies that would "enable [M.F.] to develop and elaborate his ideas in more detail." *Id.*

### C. The March CSE Meeting

on March 22, 2006, a subcommittee of the District's CSE met for M.F.'s annual review for the 2006–07 school year. District's 56.1 Statement ¶ 78. The Parent and M.F. attended the meeting. *Id.* ¶ 79. The CSE's recommendations were "[b]ased on the latest psychological, educational, and speech/language reports, information regarding his classroom functioning, parent information, and committee discussion." District Ex, 20 at 5.

The CSE recommended an integrated daily consultant teacher program for English and social studies as well as weekly group counseling. District Ex. 20 at 1–2. It was also decided that given M.F.'s progress in language skills, the speech language services would be discontinued for 2006–07. District Ex, 20 at 5. Other pro-

gram modifications included providing M.F. with a copy of his class notes and testing accommodations. *Id.* at 2.

The CSE also recommended placing M.F. in a building support and a developmental reading class during the 2006–07 school year. District's 56.1 Statement ¶ 90; Tr. 79–80, 188–89. The building support class was not mentioned in the March IEP. Parent's 56.1 Statement ¶ 90. As the SRO explained, however, the building support class "did not appear on [M.F.'s] IEP because building supports were regular education services." Cuddy's Aff. Opp'n Summ. J. Ex. A ("SRO Decision") at 16 (citing Tr. 23, 79–80, 188, 196–97, 229, 239, 339–40). Further, while the 2005–06 IEP also made no mention of the building support class, M.F.'s report card for that academic year clearly shows that M.F. attended such a class and received a final grade of C+. District Ex. 14. M.F.'s class schedule for the eighth grade also includes Ms. Rios' "Build Support 8B" (course ID 0198B). District Ex. 41.

The developmental reading class recommended at the March CSE Meeting was taught by Ms. Finelli, a certified reading specialist, who had previously taught M.F. during the 2005–06 school year. Tr. 80, 519. Ms. Finelli is trained in various methodologies for reading and decoding and had helped M.F. with his weaknesses in reading and the anxiety associated therewith. Tr. 487–88, 501, 511–12. Ms. Finelli further testified that during the 2005–06 school year she had used a phonologically based methodology with M.F. and that he had demonstrated one year's improvement. Tr. 505–09. Again, the Parent points out that the developmental reading Class is not mentioned in the March IEP. Parent's 56.1 Statement ¶ 90; *see* District Ex. 20 at 1. The developmental reading class, like the building support class, was a regular class and therefore not

included in the March IEP. Tr. 492, 516. Again, M.F.'s seventh grade report card shows that he obtained a B in Ms. Finelli's "Reading 7" class (course code 0177A). District Ex. 14, Furthermore, Ms. Finelli's developmental reading class (course ID 0178D) also appears in M.F.'s eighth grade class schedule. District Ex. 41.

After the March CSE Meeting, the Parent reserved the right to request another CSE meeting because she wanted to obtain an independent evaluation of M.F. Tr. 591–92, 616–17. On July 7, 2006, the District's Board of Education reviewed and approved the CSE's recommendations made on March 22, 2006. District Ex. 13. The March IEP indicated a start date of September 6, 2006, the first day of the 2006–07 school year. District Ex, 20.

D. The Parent's Rejection of the March IEP and the Unilateral Placement of M.F. at Kildonan

In a letter from the Parent to Dr. Klein dated September 1, 2006, the Parent notified the District that she was rejecting the March IEP, and that she was unilaterally placing M.F. at Kildonan starting on September 12, 2006, and that she would be seeking tuition reimbursement for the year. District Ex. 11. Kildonan is a private co-educational boarding and day program for students with dyslexia. Tr. 407. The foundation of the Kildonan program is a one-to-one language tutorial where students receive multi-sensory instruction in language skills based on the principles of Orton–Gillingham, the method in which Ms. Finelli is trained. District's 56.1 Statement ¶ 154.

E. The September 2006 CSE Meeting

On September 6, 2006, the first day of the 2006–07 school year, a subcommittee of the CSE reconvened to review M.F.'s program (the "September CSE Meeting").

District's 56.1 Statement ¶ 112. The meeting was not held earlier because the CSE chairperson wanted the teachers that would be teaching M.F. in fall 2006 to participate in the program review, and it would have been difficult for all the teachers to meet in the summer. Tr. 592.

The Parent and M.F.'s private therapist attended the September CSE Meeting. District's 56–1 Statement ¶ 113. The CSE maintained the program recommendations and related services from the March CSE Meeting and based on the Parent's concerns regarding M.F.'s weaknesses in reading, recommended an additional one-on-one class for reading which would be taught by Ms. Finelli. *Id.* ¶ 117; Tr. 22, 520–22. One of the members of the September CSE subcommittee, Me. Rios, testified that after the meeting, she contacted all of M.F.'s teachers to update them as to the additions made to the IEP so that the changes could be implemented immediately. Tr. 199, 237. Ms. Rios further testified that she had sent an email to the Parent the following day to inform her that she had spoken to M.F.'s teachers regarding the additional supports and would be moving forward with the recommendations made. Tr. 197–200, 227.

## F.  Procedural Posture

### 1.  Proceedings Before the IHO

On January 21, 2007, the Parent requested an impartial hearing, stating that the District failed to offer M.F. a FAPE for the 2006–07 school year, and request-ing tuition reimbursement for her unilateral placement of M.F. at Kildonan. District Ex. 5. The hearing was conducted over three days in June 2007 before the IHO. District's 56.1 Statement 1137. The IHO found that for the first semester of the 2006–07 school year the District did not have an appropriate program in place for the student on the first day of school and that the first semester of the 2006–07 school year at Kildonan was appropriate. Cuddy's Aff. Opp'n Summ. J. Ex. B (the "IHO Decision") at 5. The IHO awarded the Parent one-half of the tuition for Kildonan for the 2006–07 school year. *Id.*

### 2.  Proceedings Before the SRO

The District appealed the IHO's decision to the SRO. On December 13, 2007, the SRO annulled the IHO's decision "to the extent that it found that [the District] did not offer [M.F.] a FAPE for the 2006–07 school year and [to the extent that it] ordered that [the District] reimburse [the Parent] for half of the student's tuition at Kildonan for the 2006–07 school year." SRO Decision at 17. The SRO found that the District did offer a FAPE to M.F. for the 2006–07 school year in the least restrictive environment. *Id.*

### 3.  Motions for Summary Judgment

By notice of motion dated February 13, 2008, the District moved for summary judgment [Doc. No. 5], asking the Court to dismiss this action. The Parent cross-moved for summary judgment [Doc. No. 11]. The case was heard as a case stated [2] on March 31, 2010.

**2.** Derived from the procedures of the courts of the Commonwealth of Massachusetts, *see, e.g., Parker v. Morrell,* 59 Mass.App.Dec. 34 (Mass.Dist.Ct.1976), the "case stated" procedure is firmly established in the jurisprudence of the First Circuit. *See, e.g., Boston Five Cents Sav. Bank v. Secretary of Dep't of Hous. & Urban Dev.,* 768 F.2d 5, 11–12 (1st Cir. 1985); *Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.,* 972 F.2d 426, 429 n.

7 (1st Cir.1992); *Bunch v. W.R. Grace & Co.,* 532 F.Supp.2d 283, 286–87 (D.Mass.2008). It is a most helpful procedural device. In this session of the Court, it works like this: whenever cross motions for summary judgment reveal that the relevant facts appear without significant dispute, the courtroom deputy clerk offers the parties to treat the case as a case stated. Should they accept, as was the case here, the Court treats the undisputed

## III. RULINGS OF LAW

### A. Standard of Review

■ "Federal courts reviewing administrative determinations under the IDEA must base their decisions on a preponderance of the evidence, taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir.2003) (quotation marks omitted); 20 U.S.C. § 1415(i)(2)(C). Moreover, in reviewing administrative decisions, courts should be "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir.1998) (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 208, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)) (quotation marks omitted); *see also Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191 (2d Cir.2005) ("IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy."). Although this Court must engage in an independent review of the administrative record and make a determination based on a "preponderance of the evidence," the Supreme Court has cautioned that such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034.

In the present case, the SRO disagreed with the conclusions of the IHO. In this situation, due weight must be given to the factual conclusions of the SRO. *Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir.1984) (ruling that deference is owed to SRO even when SRO disagrees with IHO).

### B. Analysis Framework for Private Tuition Reimbursement Cases

■ IDEA mandates that states receiving certain federal funds provide a FAPE to children with disabilities. *See* 20 U.S.C. § 1412(a)(1). To meet the statutory standard, a FAPE must be administered in accordance with an IEP. 20 U.S.C. § 1412(a)(4). The statute also mandates that children with disabilities be educated in the least restrictive environment. 20 U.S.C. § 1412(a)(5). "When a state receiving IDEA funding fails to give a disabled child such an education, the child's parent may remove the child to an appropriate private school and then seek retroactive tuition reimbursement from the state." *M.S. v. Bd. of Educ.*, 231 F.3d 96, 102 (2d Cir.2000); *see also* 20 U.S.C. § 1412(a)(10)(C)(ii); 34 C.F.R. § 300.403(c). The parent is entitled to reimbursement only if the court determines that: (1) the proposed IEP was procedurally or substantively inadequate; (2) the private schooling obtained by the parent is appropriate for the child's needs; and (3) the equities support the parent's claim. *Cerra*, 427 F.3d at 192. *See Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 374, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). The burden of proof in such actions falls upon the party seeking

facts as the established record and draws the reasonable inferences therefrom without the necessity of drawing adverse inferences against each moving party, *see* Fed.R.Civ.P. 56. The facts of the case being established, the Court affords each party thirty minutes for final argument (not the usual ten minutes per party when hearing argument on a motion). In due course, the Court enters findings and rulings as required by Fed.R.Civ.P. 52(a).

relief. *Schaffer v. Weast*, 546 U.S. 49, 62, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005).

█ The inquiry thus begins with a determination of the appropriateness of the IEP. The IEP is appropriate if it (1) complied with the procedural requirements of IDEA and (2) was "reasonably calculated to enable the child to receive educational benefits." *Walczak*, 142 F.3d at 129 (quoting *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034). "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034. If, however, the IEP is procedurally or substantively deficient, this Court must proceed to ask whether the private schooling obtained by the parents is appropriate to the child's needs.

1. Procedural Requirements for an IEP

IDEA and implementing regulations set out numerous procedural requirements regarding the formulation and content of an IEP. To ensure parent participation in the formulation of the IEP, the implementing regulations require a district to: (1) notify the parent of an IEP meeting sufficiently in advance and (2) schedule the meeting at a mutually convenient time and place. 34 C.F.R. § 300.345. A student's IEP is prepared by the IEP team. The IEP team must comprise of the following individuals: the parents, at least one regular education teacher (if the child is participating in regular education), at least one special education teacher or provider, an administrator, any other person invited by a parent or the district who has knowledge or special expertise regarding the child, and, if appropriate, the child. 20 U.S.C. § 1414(d)(1)(B). Generally, in formulating the IEP, the IEP team must consider: "(i) the strengths of the child; (ii) the concerns of the parents for enhancing the education of their child; (iii) the results of the initial

evaluation or most recent evaluation of the child; and (iv) the academic, developmental/ and functional needs of the child." 20 U.S.C. § 1414(d)(3).

Not every procedural error in the development of an IEP renders it inadequate under the IDEA. *Grim*, 346 F.3d at 391. If a procedural violation is alleged, a court may find that a child did not receive a FAPE only if the procedural inadequacy: (1) impeded the child's right to a FAPE; (2) significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a FAPE to the child; or (3) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii); *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524–25, 127 S.Ct. 1994, 167 L.Ed.2d 904 (2007).

2. Procedural Appropriateness of the March IEP

a. Reliance on Allegedly Out–Dated Evaluations

█ The Parent asserts that the District committed procedural errors in the development of the March IEP, rendering it invalid. First, the Parent claims that the March IEP was based mostly on outdated evaluations, alleging that update-to-date evaluations were not available until after the March CSE meeting. The March IEP states, however, that it was based upon, *inter alia*, Dr. Patricola's Psychological Evaluation dated 12/03/2005 and the Speech Language Report dated 10/27/2005, both of which were conducted as part of the triennial re-evaluation of M.F. District Ex. 20 at 5. Further, even though Mr. Buckley's education evaluation report was not written until June 2006, the test results from the evaluation were available and shared at the March CSE Meeting. Tr. 344–45.

The Parent appears to argue that the unavailability of Mr. Buckley's educational

evaluation report at the March CSE Meeting meant that the March IEP did not address M.F.'s inability to break the language code. Parent's Mem. Law Opp'n Summ. J. at 16 The Parent appears to further argue that since no updated classroom observation was available to the March CSE, the March IEP "does not reflect [M.F.'s] disruptiveness in class, and is vague as to missing assignments." *Id.*

This Court rules that M.F.'s decoding problems were adequately addressed by the CSE's recommendation to enroll M.F. in a daily developmental reading class with Ms, Finelli, a certified reading specialist who had previously taught M.F. during the 2005–06 school year. As Ms. Finelli testified, she is trained in Recipe For Reading by Nina Traub, a reading teaching technique that focuses on decoding, and in Preventing Academic Failure, a method based on the Orton–Gillingham technique. Tr. 488. In her explanation of Preventing Academic Failure, Ms. Finelli stated that "80 percent of the words in our English language are decodeable, so these are all the rules that we use to teach children how to decode or encode, which is to spell." *Id.* at 489.

With respect to M.F.'s disruptiveness and missing assignments, the March IEP acknowledged that M.F. "shows a pattern of avoiding assignments that involve written work" and that "he can still reach levels of crisis because of a difficulty regulating negative emotions." District Ex. 20 at 4. To respond to these problems, the CSE recommended weekly counseling to continue for the 2006–07 school year, *id.* at 1, and set out a measurable annual goal that M.F. is to "turn in homework assignments on time" with a ninety percent success rate, *id.* at 6.

### b. IDEA's Written Prior Notice Requirement

While the argument was not expressly raised in the Parent's memorandum of law,

the Parent's counsel asserted at the March 31, 2010, motion hearing that failure of the March IEP to mention the developmental reading class violated IDEA'S procedural requirement that the Parent be given written prior notice whenever the District proposes to change the educational placement of the child, *See* 20 U.S.C. § 1415(b)(3). Even if omitting the developmental reading class from the March IEP violated section 1415(b)(3), however, this procedural violation did not result in an inappropriate IEP. Specifically: (1) M.F.'s right to a FAPE was not denied because M.F.'s 2006–07 class schedule shows that M.F. was enrolled in Ms. Finelli's developmental reading class for the 2006–07 school year, (2) the Parent was given the opportunity to participate in the decisionmaking process regarding M.F.'s special education because she attended both CSE meetings; and (3) there was no deprivation of educational benefits to M.F. because he was enrolled in the developmental reading class at the start of the school year. *See* 20 U.S.C. § 1415(f)(3)(E)(ii); *Winkelman,* 550 U.S. at 524–25, 127 S.Ct. 1994.

For the above reasons, this Court rules that the March IEP was not procedurally inadequate.

### 3. Substantive Requirements for an IEP

■ To be substantively adequate, an IBP must be "reasonably calculated to enable the child to receive educational benefits." *Walczak,* 142 F.3d at 129 (quoting *Rowley,* 458 U.S. at 206–07, 102 S.Ct. 3034). An IEP is reasonably calculated to confer educational benefits if it is likely to produce meaningful and non-trivial progress, not regression. *See Walczak,* 142 F.3d at 130. IDEA only guarantees an appropriate education, "not one that provides everything that might be thought desirable by loving parents." *Id.,* at 132 (quoting *Tucker v. Bay Shore Union Free*

*Sch. Dist.*, 873 F.2d 563, 567 (2nd Cir.1989)(internal quotation marks omitted)). "IDEA requires states to provide a disabled child with meaningful access to an education, but it cannot guarantee totally successful results." *Walczak*, 142 F.3d at 133. The student's recommended program must also be provided in the least restrictive environment. 20 U.S.C. § 1412(5).

■ "Likely to produce meaningful and non-trivial progress" is not a demanding standard. The Supreme Court has specifically rejected the contention that the appropriate education mandated by IDEA requires states to "maximize the potential of handicapped children." *Rowley*, 458 U.S. at 189–90, 102 S.Ct. 3034. In other words, a FAPE is not the best education a disabled student can receive, it is merely education that will allow the student to make meaningful progress. "The attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress." *Walczak*, 142 F.3d at 130.

### 4. Substantive Appropriateness of the March IEP

#### a. Failure to Mention the Remedial Reading Class in the March IEP

■ The Parent's position concerning the substantive inadequacy of the March IEP also centers around the document's failure to mention the developmental reading class. The SRO found that at the March meeting, the CSE "recommended placing [M.F.] in … a daily 42–minute developmental reading class taught by a certified reading specialist." SRO Decision at 8. Upon reviewing the administrative record, this Court finds no reason to impugn this factual finding. The developmental reading class was a regular class and therefore did not appear in the March and September IEPs, just as it did not

appear in M.F.'s 2005–06 IEP, There is no doubt, however, that the class was recommended at the March CSE Meeting because it appears in M.F.'s eighth grade class schedule. Dist. Ex. 41.

#### b. The Four Corners Rule for Evaluating Substantive Compliance of IEP

Instead of addressing the factual accuracy of the SRO's finding, the Parent contends that as matter of law, the SRO's finding was irrelevant because the March IEP "must be evaluated within its four corners" and that "provision of FAPE is adjudged from the written IEP, and not from what additional services the district's staff later claim it also would have provided." Parent's Mem. Law Opp'n Summ. J. at 16.

The Parent refers to cases decided in other Circuits to support her contention that classes not mentioned in the IEP cannot be taken into account to determine whether the IEP was appropriate. *Id.* The Parent, however, is unable to cite any Second Circuit authority. At the motion session, the Parent's counsel conceded that the Second Circuit has yet to adopt the four corners rule. The Parent relies on *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir.1994) ("The requirement of a. formal, written offer creates a clear record that will do much to eliminate troublesome factual disputes many years later about when placements were offered, what placements were offered, and what additional educational assistance was offered to supplement a placement, if any."); *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 768 (6th Cir.2001) (holding that only special services described in the draft IEP should be considered, even if there was evidence indicating what could have been provided); *A.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 682 (4th Cir.2007) (stating that an

important policy justification for the formal written offer requirement is to create a clear record of the educational placement and other services offered); and *Sytsema v. Academy Sch. Dist. No. 20,* 538 F.3d 1306, 1310 (10th Cir.2008) (noting the court's "hesitancy to analyze the substantive deficiencies of an oral offer" made at an improperly convened meeting and its reluctance "to require parents to make a similar judgment regarding a proposed IEP without a final written offer." *Id.* at 1316.)

These persuasive authorities are distinguishable from the present case on the following grounds: (1) the recommendation to enroll M.F. in the developmental reading class was made at a properly convened CSE meeting, *see Sytsema*; (2) the Parent was not merely given an oral offer, rather, M.F.'s class schedule for 2006–07 constitutes a clear written record of M.F.'s enrollment in the developmental reading class, *see Smith, A.K., Sytsema*; (3) the developmental reading class was not merely something the District could have provided, it was in fact provided to M.F. in sixth and seventh grade, *see Knable* (4) the District has a reasonable explanation for omitting the developmental reading class from the March IEP: mainstream classes are open to all students, not just those with learning disabilities.

The points of distinction between the present case and the persuasive authorities also lead the Court to conclude that, contrary to the Parent's assertion, this case is not a "good illustration" of why the four corners rule should be adopted. Accordingly, in the absence of binding authority from the Second Circuit, this Court is not prepared to rule the March IEP inadequate merely because of its failure to list a mainstream developmental reading class in which M.F. was enrolled.

### 5. Whether the March IEP was Reasonably Calculated to Confer Educational Benefits

Besides her four corners argument, the Parent did not address the issue of whether the March IEP was reasonably calculated to confer educational benefits.

"The attainment of passing grades and regular advancement from grade to grade are generally accepted indicators of satisfactory progress." *Walczak,* 142 F.3d at 130. In 2005–06, M.F. attained better than passing grades in many subjects (including an A+ in technology), District Ex. 14. Although M.F. failed a foreign language subject, the foreign language requirement was dropped in the September IEP. M.F. also showed progress in his language skills, prompting the District to discontinue speech-language services for 2006–07. A 2005–06 progress report indicated that by the end of the school year, M.F. had achieved three goals and thirteen objectives addressing study skills, reading, writing, and speech-language. District Ex. 15 at 6–9. He had not achieved two goals and two objectives addressing organization, word recognition and decoding, and error correction involving grammar in writing. *Id.* at 6–7. The progress report also indicated "some progress" for three social/emotional/behavioral goals and twelve objectives addressing self-awareness and self-concept, socially acceptable behaviors in the school environment, and improvement in decisionmaking skills. *Id.* at 8–9. Ms. Finelli tested M.F. at the beginning of the 2005–06 school year, and again at the end of the 2005–06 school year and the results indicated that he had made significant progress. Tr. 494–96, 509. Dr. Patricola, who had known and worked with M.F. for two years, noted in her psychological evaluation that his self-concept appeared to have improved as a result of the

progress he had made in his reading skills. District Ex. 22 at 5.

All of the above goes to show that M.F. was obtaining passing grades, making meaningful progress, and achieving regular advancement from grade to grade. This level of progress is sufficient to conclude that the March IEP was substantively appropriate.

### C. Appropriateness of the September IEP

Having already ruled the March IEP procedurally and substantively appropriate, there is no need to consider whether the September IEP complies with IDEA. In any event, the Parent did not raise any novel arguments concerning the inappropriateness of the September IEP, commenting only that "[w]hile the [District] did not blatantly violate IDEA procedures in September as it did in March, the two IEPS are substantively quite similar, and both suffer from a failure to offer an intensive reading program." The SRO made the factual finding that "[i]n addition to the building support class, the CSE recommended [at the September CSE Meeting] that [M.F.] receive small group remedial reading instruction as well as 1:1 reading instruction." SRO Decision at 16. The SRO concluded that "the special education and related services recommended by the September 2006 CSE addressed the student's academic, social, and management needs as indicated in the IEP and were reasonably calculated to confer education benefit upon the student." SRO Decision at 17. This Court finds no reason to depart from the SRO's conclusions about the substantive appropriateness of the September IEP.

### IV.  CONCLUSION

Since the Parent has not shown that the March IEP was procedurally or substan-

tively inappropriate, her reimbursement claim fails. Accordingly, the Court will not address the remaining prongs of the reimbursement test, including the appropriateness of M.F.'s placement at Kildonan. The District's motion for summary judgment [Doc. No. 6] is **ALLOWED** and judgment shall enter for the District.

**SO ORDERED.**